**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **LAKEFRONT PICTURES, LLC, JENNIFER KARUM and RYAN ATKINS,** | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. |
| | ) |
| **AMANDA GECEWICZ,** | ) ) |
| | ) |
| Defendant. | ) |

**COMPLAINT FOR DECLARATORY RELIEF AS TO
COPYRIGHTS, VIOLATIONS OF THE DIGITAL MEDIA
COPYRIGHT AND LANHAM ACTS AND RELATED CLAIMS**

Plaintiffs, LAKEFRONT PICTURES, LLC ("Lakefront"), JENNIFER KARUM ("Karum") and RYAN ATKINS ("Atkins"), by and through undersigned counsel, for their Complaint against Defendant, AMANDA GECEWICZ ("Gecewicz"), state as follows:

**NATURE OF THE ACTION**

1.     This action arises from Gecewicz's wrongful assertion of exclusive ownership over a motion picture and related works that were, in fact, created collaboratively with Plaintiffs.

2.     Gecewicz has improperly registered copyrights in her own name, purposefully omitting the known authors/co-authors, and used those improperly obtained registrations to issue false takedown notices under the Digital Millennium Copyright Act, as part of a smear campaign against Karum and Lakefront.

3.     Gecewicz has also repeatedly and systematically breached her contract with Lakefront and has taken steps (in conspiracy with others) to tortiously interfere with Lakefront's business, which caused and continues to cause significant harm to Plaintiffs.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction under the Copyright Act of 1976, 17 U.S.C. § 101 et seq., the Digital Media Copyright Act, 17 U.S.C. § 512 and Lanham Act, 15 U.S.C. §1125(a), and pendant jurisdiction pursuant to 28 U.S.C. § 1367 as to the remaining claims.

5. This Court has personal jurisdiction over Gecewicz, a citizen of and domiciled in Illinois, who engaged in conduct in Illinois that give rise to and caused injury in Illinois.

6. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District.

## THE PARTIES

7. Plaintiff Karum is an individual who is a citizen of and domiciled in Illinois, who works and resides in Cook County, Illinois. Karum is neuro-diverse, and on the autism spectrum. Through theater, Karum developed a sense of confidence and belonging that eventually led her to study theater and dance in college, and she pursued a professional career in films. While on set, she carefully studied and engaged with directors, assistant directors and producers to learn about all aspects of the film industry and has parlayed her experiences into a career as an actor, writer and producer. Karum uses her maiden name, Goodman in connection with her acting roles.

8. Plaintiff Atkins is an individual who is a citizen of and domiciled in the State of Illinois, who works and resides in Cook County, Illinois. Karum met Atkins when she auditioned for a role on a project he was spearheading. Atkins had film credits as a cinematographer, director, and editor over the course of several years in the industry. Karum and Atkins quickly developed a strong synergy, and they began working together on various projects, eventually co-founding Lakefront, a production company with the mission of supporting and promoting other neuro-diverse artists and giving voice to a group that is underrepresented in the film industry.

9.      Plaintiff Lakefront is a limited liability company organized and existing under the laws of the state of Illinois of which Karum and Atkins are its sole members and Managers. Lakefront, Karum and Atkins may collectively be referred to as "Plaintiffs."

10.      Defendant Gecewicz is an individual who is a citizen of and domiciled in the State of Illinois, who on information and belief resides in Lake County, Illinois.  Gecewicz holds herself out as a director, writer and producer, and as such, competes with Lakefront.

## ALLEGATIONS COMMON TO ALL COUNTS

### *Development of the Film, Blackhatter*

11.      In or about the fall of 2021, Gecewicz met with Karum (with whom she had previously worked) about developing a short film around an idea and story line about a criminal figure who encounters a dark mysterious figure who offers him a chance at redemption, but at a significant price. The film eventually would be titled *Blackhatter.*

12.      Gecewicz executed a "Production Agreement" with Lakefront dated September 21, 2021, pursuant to which Lakefront was engaged as the Production Company for the film, with sweeping responsibilities and authority for all aspects of the production, with Karum and Atkins being also hired as the film's "main producers."  A true and correct copy of the Production Agreement is attached as **Exhibit A**.

13.      The monetary compensation paid to Lakefront, Karum and Atkins in connection with the project was below market, but Lakefront, which was in its early stages of development, as well as Karum and Atkins valued the Production Company and Producer credits and promotional exposure to which Plaintiffs were assured under the Production Agreement for their respective portfolios.

14.      To that end, the Production Agreement, Gecewicz expressly agreed:

- to provide Lakefront "IMDB credit, First Position Title Credit with Lakefront Pictures animated logo on both intro and outro credits, and … to

3

promote Lakefront Pictures as the Production Company on any and all Publicity relating to 'Blackhatter' in perpetuity." (Agreement, par. 1);

- To provide Karum and Atkins "individual IMDB credit, Single Card Title Second and Third Position in the Opening Titles of the Film and outro credits, and…to promote Ryan Atkins and Jennifer Karum as the Producers on any and all Publicity relating to 'Blackhatter' in perpetuity." (*id.*, par. 2);

- that "Ryan Atkins and Jennifer Karum and Lakefront Pictures, LLC will be attached to the project from Development through all post-production, festival submissions, distribution pitches and up and through negotiations for distribution…" (*id.*, par. 8);

- To include Lakefront Pictures, LLC, Ryan Atkins and Jennifer Karum "in any and all pitch materials, publicity, marketing, social media and press kits for Blackhatter, or any name under the current story with the previous title Blackhatter." (*id.*, par. 19); and

- to invite Ryan Atkins and Jennifer Karum "to the premiere events, festivals, publicity events and pitch meetings related to 'Blackhatter'…" (*id.*, par. 23).

15. Pursuant to the Agreement, Gecewicz further agreed not to slander Lakefront, Atkins and/or Karum in any manner, whether purporting to express fact or opinion, and that obligation would survive the completion of the project and continue into perpetuity. (*Id.*, par. 20).

16. Notably, Lakefront did not assign any intellectual property rights to Gecewicz under the Production Agreement. To the contrary, under the Production Agreement, Gecewicz merely retained ownership of the profit rights with respect to the film, subject to certain back-end participation rights to which Lakefront would remain entitled.

17. Lakefront's worked extensively to develop a script for the film, the first draft of which was prepared by Lakefront's paid intern (Sarah Quinn). While the intern's work qualified as work-for-hire, she expressly transferred any and all rights to the script to Lakefront for value on September 26, 2021.

18. Karum substantially revised and eventually finalized the script, with little meaningful input from Gecewicz. At no time did Lakefront transfer or assign any interest in the script/screenplay it developed to Gecewicz. In fact, the final screenplay bears a Lakefront copyright symbol.

19.     With a screenplay in hand, Lakefront then began preparing for filming, including preparing storyboards, developing character profiles, designing wardrobe mock-ups, scouting for film locations, serving as casting director and hiring cast and crew, including a gun armor.

20.     Lakefront also oversaw all of the filming, and Atkins was Director of Cinematography on the project. Nearly all of the filming of *Blackhatter* occurred over a two-day period in mid-November 2021. While Gecewicz insisted on directing the film (her first attempt at directing) she needed near constant handholding during the first day of filming from a seasoned director, Vincent Shade, who was hired as a director consultant.

21.     During the second day of filming, Gecewicz was still largely overwhelmed by the responsibilities of the position, and ceded second day direction almost entirely to Karum, who kept the production on track and on budget. Lakefront and Atkins were also involved throughout the post-production editing process.

22.     The collaborative effort yielded a finished product with which all parties were proud, and Lakefront, Karum and Atkins were each given the appropriate credits to which they were respectively entitled by the terms of the Production Agreement.

23.     For her part, Gecewicz insisted that with respect to the on-screen credits and film poster, she receive credit as the film's Director, relegating the roles of both Vincent Shade and Karum (who actually deserved at least co-director credit) to "Director Consultants," to which Karum and Shade consented.

24.     Similarly, because she originated the idea for *Blackhatter,* Gecewicz insisted that with respect to the on-screen credits and film poster, that she should also receive writer credit (with Sarah Quinn), with Karum credits as the "Story Editor," to which Lakefront and Karum also consented (although Lakefront never transferred any intellectual property rights to the script or screenplay to Gecewicz.

25.    The original film poster (below) reflects the collective agreement as to the on-screen credits and film poster credits:



26.    Although there was subsequent tension and discussion between Gecewicz and Karum, as to whether Karum should be entitled to co-director credit on IMDB, the parties ultimately decided that Gecewicz would be listed as the only director, while Karum would receive director-consultant credit (in addition to credit as a Producer, Story Editor, Production Coordinator, and Casting).  There were never any further discussion or debate as to proper credits with respect to the *Blackhatter* film.

6

27. Lakefront, Karum and Atkins vigorously promoted the film through their respective social media accounts, as well as their roles as producers. Gecewicz never made any objection to any such promotion at the time.

28. The film won a festival award, and (ironically) Gecewicz was recognized for her "directing." Gecewicz lauded Lakefront and its team for their work on the award-winning film.

29. And while neither Lakefront, Karum nor Atkins have received any back-end royalty, they benefitted from their credits, promoting their work on *Blackhatter* on their website, in social media, in demo reels, behind-the-scenes still photography and related promotional materials stored or displayed online. Again, Gecewicz made no seasonable objections to any such promotion of the film, from which she benefitted.

***Jordan Ancel Declares War on Karum and Lakefront***

30. After completing its work on *Blackhatter,* Lakefront's professional attention shifted to work on a feature length film called *The Unseen*, a supernatural thriller on which Karum had begun working in 2020.

31. Through considerable effort, Lakefront successfully raised capital to cover more than half of the film's proposed budget from outside investors, and secured a commitment from R.J. Mitte, best known for his recurring role on the acclaimed series, *Breaking Bad*, for the lead role in the film. Karum reserved a small supporting role in *Blackhatter* for herself (as Mitte's character's older sister).

32. Atkins and Karum concurred that for *The Unseen*, LFP would bring in an extra producer to help manage the set when Karum was acting, so that she could otherwise focus on her acting role, and so that Atkins could focus primarily on cinematography.

7

33.     Eventually Lakefront engaged Jordan Ancel to serve as the third Producer. Karum knew of Ancel from his "Thriving Actors" Facebook Group in which he offered coaching/mentoring services to aspiring actors, touting his experience as a producer.

34.     Ancel joined the film as a third producer during the final portion of the "development phase" of the project and showed initial enthusiasm toward the project and contributed helpful story-line ideas to the project.

35.     Once on set, however, Ancel showed almost no interest in fulfilling the role and responsibilities for which he was actually hired, proving unwilling or incapable of anticipating even basic production needs or planning ahead for contingencies, instead spending most of his time away from the set glad-handing (rather than managing) the film's lead actors, among select members of the cast and crew.

36.     When cast or crew approached Ancel with any issue, he reflexively blamed others, mostly Karum and/or Atkins (even when it was his fault), abdicating any semblance of leadership or a willingness to make necessary decisions that were unpopular.

37.     At other times, when Ancel was eager to portray himself as the one in charge, he would act unilaterally and impulsively, including with respect to personnel decisions.

38.     Moreover, when he did not get his way, Ancel would fly off the handle and get aggressively angry, often threatening to have his minority investors "pull their funding" or to have the Screen Actors Guild (SAG) shut down the project.

39.     Ancel was misogynistic and verbally abusive, frequently engaging in tirades laced with grotesque profanity that should never be tolerated in any work environment.

40.     Ancel also displayed terrible professional judgment, by using marijuana on set—an express violation of SAG—and most disturbingly, giving cannabis-infused gummies to interns, including at least one who was below the legal age of consumption.

8

41. Ancel also tried to weaponize Karum's autism, bullying her, and often doing so in front of the cast and crew to embarrass her and foment division on the set, creating an unnecessarily stressful work environment, and one that was particularly difficult for Karum (as someone who is neuro-diverse).

42. In short, Ancel's tenure on set as third producer was an unmitigated disaster, and after filming ended, Ancel (who was paid in full) was advised by LFP that his services would no longer be necessary, relieving him of any post-production responsibilities. Ancel became irate, sending Karum a barrage of profanity-laced texts that were as vile and offensive as they were threatening, referencing his desire to "burn her life down," and "ruin" her and her Company,

43. To make good on those threats, he began telling anyone who would listen that Karum was "dangerous," and falsely telling people that she baselessly had accused him of sexual assault (which she did not).

44. Ancel commenced a suit against Karum sounding in Defamation and False Light Invasion of Privacy, specifically repeating the allegation that Karum wrongly accused him of sexual assault. While Ancel's complaint alleges that Karum made false statements that painted him in a "false light," the truth is that it was Ancel who widely disseminated the complaint on social media, and even (via his counsel) to at least one industry publication (Reel Chicago) to spread the lie that Karum had falsely accused him of sexual assault.

45. Then, portraying himself as the victim, Ancel boasted in a popular Facebook Group comprised primarily of varying Chicago-based persons in the film industry that he had a strategy for "taking down" Karum "in an epic way." Ancel began to falsely represent across social media that there was a class action suit against Karum and/or LFP in the works, in an effort to mislead people into believing that Karum had a history of making false accusations and encouraging people to spread the word about it.

9

46. In the meantime, after rallying his sycophants to speak out against Karum on social media, Ancel was confronted in Court about the lack of any proof that Karum had ever made any such false allegation of assault against him. Tellingly, Ancel dropped the allegations about Karum's accusation of sexual assault, tacitly admitting that the claim was baseless, yet never took steps to correct or clarify his broad public statements to the contrary, causing severe and substantial reputational harm to Karum, who has been harassed and cyber bullied by Ancel and his supporters.

47. Any time that someone promotes an engagement or project with Lakefront, they were inundated with comments, messages and/or communications with a coordinated warning or theme—that working with Karum and LFP are "dangerous," and falsely claiming that Karum has been blackballed in the Chicago film community, myths that Ancel started and has actively promulgated directly, and through his proxies.

48. Ancel also encouraged Candice Rose, a Chicago area actor who Lakefront had cast in The Unseen, to attack and bad-mouth Karum on social media, and also to Chicago area casting directors and talent agents and/or agencies.

49. Rose had previously engaged LFP to create a scene for her demo reel, for which she gave LFP a glowing review.

50. Notably, because their respective scenes were shot during different weeks, Rose *was never even on set with Karum* yet Rose dutifully and maliciously echoed Ancel's false smears to casting directors and others about her experience, including that Karum is "dangerous."

51. Among other things, Rose induced Karum's agent to drop Karum, and directly spread false rumors, telling at least one other actor (Emma Jo Boyden) that the investors in The Unseen had sued Karum "for her misused funds," adding "I'm thrilled. Hope she goes down hard."

52. Rose, in turn, rallied her friend, Gecewicz, to join the Ancel-led campaign to malign and smear Karum and Lakefront, and as set forth below, Gecewicz was more than willing to take

up the charge, posting on Facebook in support of Ancel, and slandering and maligning Karum who she falsely accused of bullying, harassing and cyber-stalking her and her family.

***Gecewicz's Actionable Conduct***

53. Following Ancel's and Rose's initial call to arms, Gecewicz continued a sustained campaign of slander and interference maliciously aimed at Karum and Lakefront.

54. Without regards of the terms of the Production Agreement prohibiting slander, Gecewicz continued to post malicious allegations against Lakefront and Karum on social media, including the following post laden with outright lies about harassment of her and her family:



55.     Gecewicz's false and disparaging posts caused extensive reputational harm to both Lakefront and Karum that caused or contributed to multiple abrupt project cancellations that had been scheduled, and interfering with its established relationship with crew members who were forced to distance themselves from Lakefront for fear of repercussions and the risk of being blackballed.

56.     Then, without notice to Lakefront, and without regard to the terms of the Production Agreement, and the extensive work by Lakefront to turn her idea into an actional film, Gecewicz applied for copyrights, falsely claiming sole authorship of the "entire motion picture, direction, script/screenplay," pursuant to which she received—solely in her name—Copyright Registration Number PAU 4173667 for the *Blackhatter* Motion Picture.  Gecewicz similarly claimed sole authorship with respect to the project to obtain—again solely in her own name—a visual materials copyright (Registration Number VAU001499795) and dramatic works copyright (Registration Number TXU002363749).

57.     At Rose's urging, Gecewicz also called Sarah Cayce, to get Karum disinvited from a Chicago film industry networking event, telling Cayce that she and Roise did not "feel safe" around Karum.

58.     Prompted by Rose and/or Ansel, Gecewicz, an alum of DePaul University, also secretly called the University, from which Lakefront had consistently recruited interns, and persuaded the University to discontinue its internship pipeline to Lakefront, bragging to Rose in the process: "I told them to keep my name anonymous as it could cause serious issues for me," tacitly acknowledging the wrongful nature of her conduct.

59.     Without regard to the terms of the Production Agreement, and specifically the non-disparagement provision that survived the conclusion of the project, Gecewicz posted the following Google negative review, spouting her continued falsehoods:



**Amanda**
Local Guide · 22 reviews · 3 photos

★ · 50 minutes ago  [NEW]

I wasn't planning on writing this review, but after seeing their recent post, I felt compelled to share my experience.

In 2021, Jennifer convinced me to let her produce my short film 'Blackhatter' when I was still new to the industry. I am the creator, writer & director of the project. I worked with LFP for several months and it's a decision I deeply regret. In addition to Jennifer's erratic behavior and outbursts, she proceeded to give herself "director" credit on my film, which I never agreed to nor did she earn that title. As you can see in the screenshot below, she continues to take credit for something she shouldn't, though I've repeatedly asked her to stop. Jennifer has no problem stepping on others to get ahead, especially those newer to the industry like myself. This is just the tip of the iceberg...

For the past 3 years, I've dealt with cyber stalking, bullying, and harassment from Jen. She has also contacted family members of mine, whom she's never met, via fake phone numbers. LFP hides under the guise that they "uplift" and "elevate" others but it's really a cover for their shady business handlings. Also, the contract I signed with them was void from the start: they spelled my name wrong AND it says "this agreement is valid through Wednesday Sept 22, 2021, at 5pm..." not very professional either.

I have a substantial paper trail confirming everything I have said. **I DO NOT GIVE LAKEFRONT PICTURES PERMISSION TO POST ABOUT MY FILM BLACKHATTER IN PERPETUITY.** The film, script, and likeness of the character have all been copy written and protected in my name.

Proceed with this company at your own discretion. I was manipulated by Jennifer to write a positive review awhile back. However, I decided to come clean about my experience in hopes that others aren't fooled or betrayed like I was. If retaliation results from this honest review, it will be well documented and handled accordingly.



60. In fact, Karum never stalked or harassed Gecewicz, and never attempted to contact any member of her family.

61. Gecewicz also conspired with Winter Davis, then an employee of the Independent Film Alliance—Chicago, seeking the expulsion of Lakefront because she otherwise felt unsafe to join IFA, and Gecewicz further directed or encouraged Davis to contact Google (which she did) to remove Lakefront's business profile, which it did (although it has since been restored).

62. Moreover, without regard to the term of the Production Agreement, Gecewicz uploaded an updated version of the film that eliminates any and all credit to Lakefront (Production Company), Karum (Producer, Story Editor, Production Coordinator, and Casting) and Atkins (Producer, Director of Photography, Sound Design and Colorist). The film is otherwise exactly the same as the one she originally uploaded with proper credit to the Plaintiffs.

63. Gecewicz similarly revised the film's promotional poster and IMDB listing to similarly remove all to Lakefront, Karum and/or Atkins, and on IMBD gave herself credits as a writer and the only producer (calling herself an Executive Producer).

64. Armed with the copyright notices she procured by fraud, and having wrongfully cleansed Plaintiffs' credit from the film, Gecewicz unleashed a torrent of takedown notices under the Digital Media Copyright Act to numerous online platforms (including Meta/Facebook, Instagram, Google, YouTube, WIX and Staff Me Up), targeting Plaintiffs for their alleged unauthorized use of copyrighted materials over which Gecewicz again falsely claimed "sole ownership," without including or referencing the Production Agreement, which would have undermined or eviscerated her claim of sole ownership and unauthorized use.

65. Based upon the purposefully misleading takedown notices, the images, posts and photographs about which Gecewicz complained were removed by or at the direction of Meta/Facebook, Instagram, Google, YouTube, and WIX, and Lakefront's Instagram and YouTube accounts were suspended.

66. The suspension of these accounts is particularly perilous for Lakefront as these platforms have been among the most furtive means of promotion of its business.

67. Moreover, the timing was particularly damaging, as Lakefront recently completed filming of a new feature film for which advance payment distribution deals require vigorous social media promotion.

68. Lakefront made a demand in writing that Gecewicz immediately rescind the takedown notices to ameliorate the threat of harm, but Gecewicz remained defiant and ignored the demand.

## COUNT I

### (DECLARATORY JUDGMENT AS TO VALIDITY OF GECEWICZ'S COPYRIGHTS)

69.     Lakefront repeats and realleges the allegations of paragraphs 1-68.

70.     As set forth above, Gecewicz made material misrepresentations in her applications submitted to the U.S. Copyright Office, vastly overstating and outright lying about her rights of "authorship."

71.     Gecewicz made her material misrepresentations with actual knowledge that her applications contained false information.

72.     On information and belief, if the Copyright Office had been apprised of and provided a copy of the Production Agreement, it would *not* have issued copyrights to Gecewicz, or at the very least, would not have issued copyrights that purport to recognize her as sole author.

73.     There is an actual case in controversy as to whether Copyrights bearing Registration Numbers PAU 4173667, VAU001499795, and TXU002363749 (collectively, the "Copyrights") are invalid and should be revoked or revised based upon Gecewicz's wrongful and deceptive conduct.

WHEREFORE, Lakefront prays for judgment in its favor and against Gecewicz as to Count I, and for an order declaring that the Copyrights were procured by fraud and should be revoked or revised, awarding costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT II

### (DECLARATORY JUDGMENT AS TO LAKEFRONT'S COPYRIGHTS WITH RESPECT TO *BLACKHATTER*)

74.     Lakefront repeats and realleges the allegations of paragraphs 1-73.

15

75. There is an actual case in controversy as to whether Lakefront is the sole and/ or a joint author of the script/screenplay for *Blackhatter* for purposes of copyright.

76. There is also an actual case in controversy as to whether Lakefront's considerable contribution to the *Blackhatter* film qualifies it to claim sole authorship (as that term is used in copyright) over the Film, as a dramatic work and with respect to the embodied visual arts, or at the very least whether its contributions constituted "joint work" for purposes of co-authorship and equal rights in such copyrights.

WHEREFORE, Lakefront prays for judgment in its favor and against Gecewicz as to Count II, and for an order declaring that for purposes of copyright, Lakefront is the sole or co-author of the *Blackhatter* script/screenplay, and that it is either the sole author of the entire film, or the co-author of the film for purposes of all applicable copyrights, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT III

### (DMCA MISREPRESENTATION (17 U.S.C. § 512(f))

77. Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-76.

78. As set forth above, Gecewicz made material misrepresentations and withheld material information in submitting takedown notices to online platforms, including Meta/Facebook, Instagram, Google, YouTube, WIX and Staff Me Up, targeting Plaintiffs for their alleged unauthorized use of copyrighted materials over which Gecewicz falsely claimed "sole ownership."

79. Gecewicz made these material misrepresentations with knowledge of or in reckless disregard as to their falsity, and withheld material information purposefully to mislead the unwitting platforms into removing content.

16

80.     As a result of Gecewicz's material misrepresentations and omissions, Plaintiffs have been injured.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count III, and for an order awarding compensatory and punitive damages in amounts to be determined at trial, awarding costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT IV

## (LANHAM ACT (17 U.S.C. § 1255(a))

81.     Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-80.

82.     The Chicago film industry is notably smaller and comparatively much less active than in other coastal markets, and there is substantial competition among local production companies seeking to produce films in Chicago.

83.     Success for a production company in Chicago is predicated substantially on building a portfolio of credits and promoting them to aspiring local area film makers.

84.     As set forth above, Gecewicz made false and misleading statements of fact in commerce, including false claims of sole authorship, sole production, and exclusive ownership of the Film in violation of 15 U.S.C. § 1125(b).

85.     These statements were made in commercial advertising and promotion and were likely to deceive consumers in the industry.

86.     Gecewicz's actions constitute unfair competition in violation of 15 U.S.C. § 1125(a).

87.     Gecewicz's actions caused competitive and reputational harm to Plaintiffs.

17

88. Gecewicz's actions were purposeful and willful, thereby justifying trebling any award to Plaintiffs pursuant to 15 U.S.C. § 1117(a).

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count IV, and for an order awarding compensatory damages in amounts to be determined at trial, which award should be trebled, and awarding costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT V

### (BREACH OF PRODUCTION AGREEMENT)

89. Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-88.

90. The Production Agreement is a valid and enforceable contract.

91. Indeed, even after she began her crusade against Plaintiffs, Gecewicz publicly acknowledged hiring Plaintiffs as producers, although she has since specifically disavowed the Production Agreement.

92. Karum and Atkins are either parties to or intended third-party beneficiaries of the Production Agreement.

93. Lakefront, Karum and Atkins fulfilled their contractual obligations under the Production Agreement and had a contractual right and justifiable expectation to receive producer's credit for their considerable work.

94. Gecewicz initially performed her obligations under the Production Agreement, before committing a series of systematic material breaches thereof described above, including the covenant of good faith and fair dealing implied therein by denying and depriving Plaintiffs of their fundamental expectancy under the Agreement.

18

95. As a result of Gecewicz's breach of the Production Agreement, Plaintiffs have been injured.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count V, and for an order awarding compensatory damages in an amount to be determined at trial, awarding costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT VI
### (UNJUST ENRICHMENT)

96. Pleading in the alternative, Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-88.

97. Lakefront, Karum and Atkins believe that the Production Agreement was and is a valid and enforceable contract, although Gecewicz now claims that the Agreement was "void from the start," even though she accepted the considerable benefits thereunder from Plaintiffs in connection with the *Blackhatter* project.

98. In exchange for their considerable work, Plaintiffs had a reasonable expectation of compensation, a substantial part of which was receiving producer's credit.

99. Denying Plaintiffs the credit that they earned would unjustly enrich Gecewicz at Plaintiffs' expense.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count VI, and for an order awarding Plaintiffs the producer's credit that they rightfully expected, or the reasonable value of that credit, and granting such additional remedies as this Honorable Court deems just and equitable.

19

## COUNT VII

### (TORTIOUS INTERFERENCE)

100.     Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-99.

101.     Lakefront had contracts with clients, as well as with Google, Meta/Facebook, YouTube, Instagram, Wix and IFA, and a reasonable expectancy of continuing an internship pipeline with DePaul University, and continued professional hiring relationship with crew members .

102.     Karum and Atkins had contracts with Google, Meta/Facebook, YouTube, and Instagram relating to the use and access of their respective accounts.

103.     Gecewicz, without any legitimate competitive justification, interfered with those contracts and expectations, as described above.

104.     As a direct and proximate result of Gecewicz interference, Plaintiffs have been injured.

105.     Gecewicz acted willfully with the express intention of harassing and harming Plaintiffs, warranting an award of punitive damages to punish Gecewicz and dissuade her from engaging in similarly wrongful conduct in the future.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count VII, and for an order awarding compensatory and punitive damages in amounts to be determined at trial, awarding costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT VIII
### (CIVIL CONSPIRACY)

106. Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-105.

107. As set forth above, Gecewicz conspired with others, including Candice Rose, Winter Davis, Katharin Mraz, and/or Jordan Ancel as part of a coordinated campaign of harassment against LFP and its principals, and interference with LFP's business with the express purpose of injuring Plaintiffs.

108. Gecewicz took acts, described above, in furtherance of the referenced conspiracy.

109. Plaintiffs have suffered economic loss, including lost opportunities, and reputational harm as a direct and proximate result of the referenced conspiracy.

110. Gecewicz acted willfully, justifying an award of punitive damages to punish and dissuade her from engaging in such tortious conduct in the future.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count VIII, and for an order awarding compensatory and punitive damages in amounts to be determined at trial and costs, including reasonable attorneys' fees, and granting such additional remedies as this Honorable Court deems just and equitable.

## COUNT IX
### (SPOLIATION OF EVIDENCE)

111. Lakefront, Karum and Atkins repeat and reallege the allegations of paragraphs 1-110.

112. Gecewicz had actual knowledge regarding the filing and specific allegations alleged in Ancel's above-referenced 2023 Circuit Court case against Karum, as well as a 2024 Complaint filed by Lakefront and Karum in the United States District Court for the Northern

21

District of Illinois (pending as case no. 1:24-cv-01108 before the Hon. Magistrate Judge M. David Weisman) against Ancel (and his companies) and Candice Rose to redress the above referenced coordinated smear campaign they were actively orchestrating.

113.    For good measure, after she posted derogatory and defamatory comments on Lakefront Pictures' Google page (see above), in direct violation of the mutual non-disparagement clause in the Production Agreement, on July 31, 2024, the undersigned emailed Gecewicz putting her on notice "**to preserve all documents relevant to your communications with or about Lakefront Pictures and/or Mr. Ancel including all documents, records, files, data compilations, communications (including emails, text messages, direct messages, posts and comments on any social media channel or message board), whether stored in hard copy or electronic format), and all tangible objects that are in their possession, custody and/or control, and must cease all file deletion or destruction, whether contemplated as part of a formal retention/destruction policy or not.**"  (emphasis in original).

114.    As such, Gecewicz had a duty to preserve relevant evidence.

115.    Notably, in her derogatory post, Gecewicz boasted that she had "a substantial paper trail" to support her claims against Lakefront and Karum, but when she was subpoenaed shortly thereafter, she claimed to have no responsive documents.

116.    Moreover, it is clear from the document productions made by others, that Gecewicz sent or received a substantial number of responsive (and incriminating) communications that were responsive to the subpoena served upon her.

117.    On information and belief, Gecewicz breached her duty to preserve evidence by purposefully deleting or destroying damning communications, with knowledge that they were relevant to pending litigation and/or after receiving the referenced email demanding that she preserve the relevant evidence.

118.     On information and belief, Gecewicz acted in bad faith in destroying material evidence to shield herself and others from liability, some of which may not be obtained or obtainable from other sources.

119.     Gecewicz's breach of duty has caused substantial prejudice to Plaintiffs, including adversely impacting their ability to prove claims or defenses, causing them to needlessly incur incremental litigation costs, and potentially limiting their ability to recover appropriate damages.

120.     Gecewicz knew or should have known that her failure to preserve evidence would cause precisely this harm.

WHEREFORE, Plaintiffs pray for judgment in their favor and against Gecewicz as to Count IX, and for an order requiring Gecewicz to provide access to her mobile phone(s), tablet and computer(s) for imaging and forensic search (at her expense) to confirm and attempt to recover wrongfully deleted files, awarding compensatory damages in amounts to be determined at trial and granting costs, including reasonable attorneys' fees, and such additional remedies as this Honorable Court deems just and equitable.

Respectfully submitted:

Dated: April 10, 2026          **LAKEFRONT PICTURES, LLC, JENNIFER KARUM and RYAN ATKINS**

By:      */s/ George J. Spathis*
                One of their Attorneys

George J. Spathis (#6204509)
(gspathis@lplegal.com)
LEVENFELD PEARLSTEIN, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
Phone: (312) 346-8380

23

# EXHIBIT A



<u>PRODUCTION AGREEMENT</u>

THIS AGREEMENT dated on September 21, 2021, is between Lakefront Pictures, LLC, Ryan Atkins & Jennifer Karum, Chicago, Illinois ("Producers") and Amanda Gecewicz, ("Owner") at 20813 Lone Pine Ct, Deer Park, IL 60010 for the Short film "Blackhatter" ("project"), and this agreement is entered into effect as of September 22, 2021. The Producers and Owner intend to produce Owner's Short Film, Blackhatter.

**ACCORDINGLY, IT IS AGREED AS FOLLOWS:**

1. Amanda Gecewicz has agreed to hire Lakefront Pictures, LLC as the Production Company for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Lakefront Pictures, LLC, in the amount of $7,000 which will include a line item of payment toLakefront Pictures, as well as remaining funds to a seperate bank account under Lakefront Pictures to produce the project, and will provide Lakefront IMDB credit, First Position Title Credit with Lakefront Pictures animated logo on both intro and outro credits, and agrees to promote Lakefront Pictures as the Production Company on any and all Publicity relating to "Blackhatter" in perpetuity.

2. Amanda Gecewicz has also agreed to hire Ryan Atkins and Jennifer Karum as the main Producers for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Jennifer Karum and Ryan Atkins allocated in the budget for Producer roles, along with providing individual IMDB credit, Single Card Title Second and Third Position in the Opening Titles of the Film and outro credits, and agree to promote Ryan Atkins and Jennifer Karum as the Producers on any and all Publicity relating to "Blackhatter" in perpetuity.

3. In addition, Amanda Gecewicz agrees to pay Lakefront Pictures, LLC $7,000 which includes cost to cover hiring personnel, securing locations, on-set insurance, food, catering, and anything necessary to produce the project. Amanda is aware that should Lakefront deem a need for further funds, Lakefront Pictures will notify Amanda and provide detailed information for such a request. Honoring the request for additional funds will be at Amanda Gecewicz's full discretion understanding it may impact the success of her film.

4. Producers agree to provide film knowledge, consulting services, hire crew, and provide support to the best of their ability to Owner.

5. Producers will put together deadlines, and information to best help and position Amanda Gecewicz for success to the best of their ability.

6. Producers will be on set every day of filming to guide the process and provide services and will be paid for their time on set. Should they not be able to be on set for any reason, they will provide written documentation via email of dates they cannot be on set. Medical emergencies, and family related emergencies will be excused and will not impede on production.

7. Amanda understands producers will be actively assisting to ensure directing captures the best footage but also maintains a smooth operation ensuring no hinderance on set. Amanda agrees to be amicable and open to adjustments deemed necessary by Producers for a successful completion of the project.

8. Ryan Atkins and Jennifer Karum and Lakefront Pictures, LLC will be attached to the project from Development through all post-production, festival submissions, distribution pitches and up and through negotiations for distribution, should there be such conversation.

9. In the event of separation, Producers and Production Company will be paid up to services provided, and given credit on IMDB and in credits of movie for positions fulfilled. If Development work is completed, the Lakefront Pictures animated Logo will be used regardless of any separation for "Blackhatter." along with IMDB credit, and payment agreements. No refunds will be provided once deposit is made.

10. Amanda Gecewicz authorizes Producers to hire crew, bring on teams to provide services for the filming of "Blackhatter," and to hire vendors necessary for filming.

11. Amanda agrees to provide minimum ½ of the budget payable to Lakefront Pictures in order for Lakefront Pictures to provide services at the time of signed agreement for production purposes in the amount of $3,500. If Amanda does not provide ½ the budget to Lakefront Pictures, LLC she will provide debit cards and proof of funds to Lakefront Pictures with access for Lakefront Pictures to ensure monies are available at any given time. In the event only ½ the funds are provided at time of signing, any additional funds not provided that result in overdraft charges will not be liability or responsibility of Lakefront Pictures, LLC and no payment will be expected from Lakefront Pictures, now or in the future.

12. Amanda understands that agreements with hired personnel will be in written contract between Amanda Gecewicz, or a formed LLC with Amanda as owner, and in signing confirms that Lakefront Pictures is only



acting on behalf of Amanda, her LLC if she chooses to create one; solely to administer paperwork for crew, and pay agreed upon payments to freelancers for the project. In the case that Amanda doesn't provide full payment to Lakefront Pictures, LLC to administer funds to personnel, Lakefront Pictures will not be held responsible or held liable to any 3rd party and is free and clear of any legal liability now or in the future.

- Amanda agrees that Lakefront Pictures, LLC and its members are only responsible for funds administered to Lakefront Pictures and only liable for funds in their possession related to agreed services for freelancers.

13. All contracts for actors, agents and freelancers will be with Amanda Gecewicz or her LLC, and Lakefront Pictures, LLC will not be liable for contracts regardless of Lakefront Pictures acting on behalf of Amanda, or any LLC formed and Lakefront Pictures, LLC will not be liable for any financial obligations to freelancers outside of agreed contracts between Owner and freelancer and Owner and vendor.

- Any lawyer fees, due to additional lawyer written contracts, or agreements related to crew, locations and filming, separate than what Lakefront Pictures provides, will be funded and provided by Owner in addition to $8,900 should legal be deemed necessary.

14. Amanda may be asked to provide insurance for set

15. Ananda may be asked to provide stunt coordinators for safety of actors and crew

16. Amanda agrees to a line item in the budget in the amount of $1,200 to hire Lakefront Pictures to produce the picture, not including additional line item should the film receive risiduals, profits and the like.

17. Any additional Producers Owner brings to the project, outside investors attachment, will need written approval by Producers along with agreement in writing.

18. Owner agrees to weekly communications on any and all updates/progress reports in regards to Development, Pre-Production, Production and pitching the film, along with any feedback that comes from potential licensees/studios/recipients/investors/festivals.

- Owner agrees to inform Producers of any network deal, distributor or 3rd party licensing in writing and agrees to attach Producers to the pitch to any 3rd parties. Producers understand there is no guarantee of future attachment from any network, studio or acquisition.

19. Lakefront Pictures, LLC, Ryan Atkins and Jennifer Karum will be in any and all pitch materials, publicity, marketing, social media and press kits for Blackhatter, or any name under the current story with the previous title Blackhatter.

- Upon Sale, acquisition or partnership, each Producer is entitled to 3% of Producer's Share Pro Rata pari passu with all Producers on the project.
- Lakefront Pictures, LLC will have a line item in the budget of 3% to be paid at the time of acquisition or buyout on top of $1,200 line item in budget.

20. Producers agree to not slander, deter, or else negatively influence others' decisions or participating individuals whether fact or opinion in perpetuity. Amanda agrees to not slander Producers or Lakefront Pictures whether deemed fact or opinion in perpetuity.

21. Producers are aware "Blackhatter" will be sharing proprietary storylines, future storylines and pitch materials, along with any additional marketing materials in association with the project. Producers agree to not utilize concept ideas with any 3rd party to produce the story, without written consent permission from Amanda Gecewicz.

22. Provided that Amanda Gecewicz and her team receive distribution, or a studio acquisition, on top of 3% Lakefront Pictures, LLC will receive 5% of the pro-rata share of Producer funds, and will be attached to any future project, as long as the studio agrees. Contracts will be negotiated at time of offer.

23. Producers, Ryan Atkins and Jennifer Karum will be invited to the premiere events, festivals, publicity events and pitch meetings related to "Blackhatter" and depending on Amanda Gecewicz's budget, Amanda will make every effort, in good faith, to pay for Jennifer Karum and Ryan Atkins of Lakefront Pictures to be present, including covering any hotel costs, flight, per diem and food. However it is agreed between the parties, Sundance, SXSW, Cannes or any international will be paid for in full for Jennifer Karum and Ryan Atkins.

- Should Amanda not be in a position to pay for Jennifer Karum and Ryan Atkins, to attend meetings or festivals there will be a deferred payment of the cost if and when Blackhatter makes net profit.
- Amanda will inform Jennifer Karum and Ryan Atkins of all festivals she applies to, and it will be a separate budget from the $7,000 that the funds for submissions come from



- Amanda will ensure that Jennifer Karum and Ryan Atkins are aware of all flights and hotels Amanda books in effort to assist in providing them sufficient details for booking should Jennifer Karum and Ryan Atkins attend any festivals or pitch meetings.

24. Indemnity / Insurance. Company shall indemnify and hold harmless Producers from and against any claims, liabilities, costs or other amounts (including reasonable legal fees and costs) suffered by Producers in connection with the development, financing, production, marketing and/or exploitation of the film, excluding any matter arising out of Producer's gross negligence, willful misconduct and/or intentional violations of the terms of this Agreement. Producers will at all times be named as an additional insured party on general liability and errors and omissions insurance policies maintained by the Company in connection with distribution, exploitation, advertising and promotion of the Film. Such insurance coverage to extend through at least the second (2nd) annual anniversary of the initial commercial exploitation of the Short.

25. Filming dates scheduled for Nov 12th weekend and should it change, Producers must be notified snd dates agreed upon herein.

26. In signing the agreement below, Amanda Gecewicz agrees to pay $3,500 down payment for sign-on development to Lakefront Pictures, LLC which includes services provided herein by Lakefront Pictures and in addition, $3,500 by Oct 15 for the purpose of pre-production, production, and editing. Amanda is aware, should Lakefront Pictures be asked to provide specific editor, or post-sound or color requests, budget may change and more funds may be needed to meet such requests. As it stands, the color and sound will be included in this rate unless specific request for additional workshop of sound and color is requested.

This agreement is valid through Wednesday Sept 22, 2021, at 5 PM

Both parties enter and agree to the terms

9/21/2021

_____
Owner(s) Signature of Lakefront Pictures, LLC        Date

_____        9/21/21
Owner Signature of Amanda Gecewic        Date