**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAKEFRONT PICTURES, LLC, JENNIFER KARUM and RYAN ATKINS,** | ) ) ) | |
| | ) | Case No. 1:2026-cv-04038 |
| Plaintiffs, | ) | |
| vs. | ) | Hon. Judge Thomas M. Durkin |
| | ) | |
| **AMANDA GECEWICZ,** | ) | Hon. Mag. Judge Gabriel A. Fuentes |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
EMERGENCY MOTION FOR LIMITED INJUNCTIVE RELIEF**

Plaintiffs, LAKEFRONT PICTURES, LLC ("Lakefront"), JENNIFER KARUM ("Karum") and RYAN ATKINS ("Atkins"), submit this Memorandum of Law in Support of their Emergency Motion for Limited Temporary and Preliminary Injunctive Relief (the "Motion") that is necessary to reinstate Lakefront's and Atkins' Instagram and Facebook accounts that are critical to their business, but were disabled as a result of actions taken by Defendant, AMANDA GECEWICZ ("Defendant"), and prevent the further disabling of any of Plaintiffs' social media accounts.

**RELEVANT FACTS**

Plaintiffs incorporate by reference the allegations of their Complaint filed in the captioned matter, with those relevant to the Motion summarized below, and supported by the Declarations of Karum ("Karum Decl.") and Atkins ("Atkins Decl."), submitted herewith as **Exhibit A** and **Exhibit B**, respectively.

*Development of the Film, Blackhatter*

In 2021, Defendant met with Karum about developing a short film (less than 10 minutes) around an idea and story line that Defendant had conceived. The film eventually would be titled

*Blackhatter* (the "Film"). That initial meeting ultimately led to Defendants' execution of a "Production Agreement" with Lakefront dated September 21, 2021, pursuant to which Lakefront was engaged as the Production Company for the Film, with sweeping responsibilities and authority for all aspects of the production, and with Karum and Atkins being also hired as the film's "main producers." A true and correct copy of the Production Agreement is attached as an Exhibit to the Complaint filed in the captioned action, and submitted herewith as **Exhibit C**. The monetary compensation paid to Lakefront, Karum and Atkins in connection with the project was below market (particularly given the sweeping responsibilities placed upon them), but Lakefront valued the Producer credits and promotional exposure to which they were assured under the Production Agreement. *See* Karum Decl., at ¶¶ 4-7; *see also* Atkins Decl. at ¶ 3.

More specifically, by executing the Production Agreement, Defendant expressly agreed:

- to provide Lakefront "IMDB credit, First Position Title Credit with Lakefront Pictures animated logo on both intro and outro credits, and … to promote Lakefront Pictures as the Production Company on any and all Publicity relating to [the Film] in perpetuity." (Agreement, par. 1);

- To provide Karum and Atkins "individual IMDB credit, Single Card Title Second and Third Position in the Opening Titles of the Film and outro credits, and…to promote Ryan Atkins and Jennifer Karum as the Producers on any and all Publicity relating to [the Film] in perpetuity." (*id*., par. 2);

- that Atkins, Karum and Lakefront could "be attached to the project from Development through all post-production, festival submissions, distribution pitches and up and through negotiations for distribution…" (*id*., par. 8);

- To include Lakefront, Atkins and Karum "in any and all pitch materials, publicity, marketing, social media and press kits for [the Film], or any name under the current story with the previous title Blackhatter." (*id*., par. 19); and

- to invite Atkins and Karum "to the premiere events, festivals, publicity events and pitch meetings related to [the Film] …" (*id*., par. 23).

*See* Exhibit C. Moreover, nothing in the Production Agreement prohibited or restricted Lakefront, Karum or Atkins from promoting the Film or their considerable roles in and contributions to the

Film. But most notably for purposes of this litigation, Lakefront did not assign any intellectual property rights to Defendant under the Production Agreement. Quite the contrary, under the Production Agreement, Gecewicz merely retained ownership of the profit rights with respect to the film, subject to certain back-end participation rights to which Lakefront would remain entitled. *Id. See also* Karum Decl. at ¶ 8.

Lakefront developed a script for the film, the first draft of which was prepared by Lakefront's paid intern (who assigned any and all rights to the script to Lakefront for value on September 26, 2021). Thereafter, Karum revised and eventually finalized the script. Lakefront did not transfer or assign any interest in the script/screenplay it developed to Defendant. In fact, the final "Production Draft" of the script (which is only four pages long) circulated to cast and crew (including Defendant) bears the following copyright notice:

```
Lakefront Pictures LLC
Chicago IL
©2021
```

Once the script was completed, Lakefront prepared storyboards, developed character profiles, designed wardrobe mock-ups, scouted film locations, and hired cast and crew. Lakefront oversaw all of the filming, with Atkins serving as Director of Cinematography on the project. Nearly all of the filming of *Blackhatter* occurred over a two-day period in mid-November 2021. The collaborative effort yielded a finished product for which Lakefront, Karum and Atkins were each given the appropriate credits to which they were respectively entitled by the terms of the Production Agreement. Defendant, in fact, approved the on-screen credits to Lakefront, Karum and Atkins. Defendant even bestowed a "Director Consultant" credit upon Karum who stepped in as director on the principal day of filming. Karum Decl. at ¶¶ 8-12; *see also* Atkins Decl. at ¶¶ 4-6.

3

Lakefront, Karum and Atkins vigorously promoted the film through their respective social media accounts, as well as their roles as producers, to which Defendant never made any objection (and from which she benefited). The Film even won a festival award, prompting Defendant to laud Lakefront and its team for their work. And while neither Lakefront, Karum nor Atkins has received any back-end royalty, each benefited from their credits, promoting their work on the Film on their website, in social media, behind-the-scenes still photography and related promotional materials stored or displayed online. Again, Defendant made no seasonable objections to any such use or promotion of the Film. Karum Decl. at ¶¶ 13-17.

### *Defendant's Dramatic About-Face*

For the suspected reasons detailed in the Complaint, but otherwise irrelevant to this Emergency Motion, a little more than a year later, Defendant completely changed her tone, tenor and attitude toward Plaintiffs, and began a viscous smear campaign against Karum and Lakefront working tirelessly to interfere with and disrupt their business. Among other things, without notice to Lakefront, and without regard to the terms of the Production Agreement, and the extensive work by Lakefront to turn her idea into an actual film, Defendant applied for copyrights, falsely claiming sole authorship of the "entire motion picture, direction, script/screenplay," pursuant to which she received—solely in her name—three separate Copyright Registrations relating to the Film.). Karum Decl. at ¶¶ 18-20; *see also* Atkins Decl. at ¶¶ 8-10.

Then, without regard to the terms of the Production Agreement, Defendant replaced the original version of the Film with an updated version that eliminated all credits to Lakefront, Karum and Atkins. The updated version of the Film is otherwise exactly the same as the original, except for these credits that were simply erased. Defendant similarly revised the film's promotional poster to remove all references to Lakefront, Karum and/or Atkins, as well as on IMBD, in which

Defendant gave herself credits as a writer (completely ignoring Lakefront's copyright as to the script) and the only producer. Karum Decl. at ¶¶ 21-22; *see also* Atkins Decl. at ¶ 11.

Then, armed with the copyright notices she procured by fraud, and having wrongfully cleansed any evidence of Plaintiffs' credit on the Film, Defendant unleashed a torrent of takedown notices under the Digital Media Copyright Act to numerous online platforms (including Meta/Facebook, Instagram, Google, YouTube, WIX and Staff Me Up), targeting each of the Plaintiffs for what she claimed was their alleged unauthorized use of copyrighted materials over which Defendant again falsely claimed "sole ownership." Notably, Defendant neither acknowledged, referenced or provided copies of the Production Agreement, which would have eviscerated her claim of sole ownership and unauthorized use, and speaks volumes as to her malicious intent. Karum Decl. at ¶¶ 19, 22-23; *see also* Atkins Decl. at ¶¶ 8-10.

Based upon the purposefully misleading takedown notices, all Film-related images, posts and photographs about which Defendant complained were removed by or at the direction of Meta/Facebook, Instagram, Google, YouTube, and WIX. But because Defendant sent multiple notices to each of the platforms, separately complaining about each Plaintiff's unauthorized use of the Firm's title, video clips, still shots, references to the Film's title on resumes, and even behind--the-scenes photos taken personally by Atkins on the set, Facebook and Instagram treated them as separate offenses, thus Lakefront's Instagram account, Atkins' Facebook account, and Karum's personal website hosted on WIX were flagged as repeat offenders, and the accounts were suspended and disabled (hereinafter, the "Disabled Accounts"). Because Atkins was the admin on the Lakefront Facebook account, his inability to access his personal Facebook account also prevents him from using the Lakefront Facebook account for any purpose (although it remains visible to the public). As a result, the Disabled Accounts cannot be accessed by anyone (including Plaintiffs), even with respect to users that had chosen to follow or subscribe to the Accounts. To a

user that either previously followed or purposely searching for "Lakefront Picture" on Instagram, it quite literally appears as if Lakefront no longer exists or conducts business. Karum Decl. at ¶¶ 24-29, 36; *see also* Atkins Decl. at ¶¶ 12-15.

### *The Ongoing Injury to Plaintiffs*

Plaintiffs promptly having provided counter-notices to Instagram and Facebook (as well as all of the other platforms from which they were advised of the Defendant's takedown notice) in accordance with 17 U.S.C. § 512(g), pursuant to which the Disabled Accounts should have been reinstated, and the subject content should have been restored. Instagram and Facebook, however, have failed and refused to reinstate the Disabled Accounts on their respective platforms, advising Plaintiffs instead:

> We recommend that you contact the party that reported your post to resolve the issue directly with them. If an agreement is reached to restore the content to the site, please have the complaining party withdraw their complaint through appropriate channel.

See Notice attached hereto as **Exhibit D**. *See also* Karum Decl. at ¶¶ 24-25, 28; *see also* Atkins Decl. at ¶ 16.

Plaintiffs, in turn, through the undersigned, requested that Defendant merely consent to limited relief—the reinstatement of Disabled Accounts, without admitting any wrongdoing and with a complete reservation of rights, and even agreed that the subject content over which the dispute arose has been removed and will not be restored while their dispute remained pending. Defendant (through her counsel) however refused even this limited relief. In fact, Defendant apparently felt so emboldened by the power that Facebook and Instagram bestowed upon her that she submitted at least one new takedown notice resulting in the recent (May 18th) suspension of Karum's personal website hosted on WIX. Karum Decl. at ¶¶ 29-30; *see also* Atkins Decl. at ¶ 17. Immediate injunctive relief is necessary to prevent further harm to Plaintiffs.

Before they were disabled, the Disabled Accounts were the principal vehicle of promotion for each Plaintiff. For Lakefront, its Instagram account was used to promote their completed projects (including movies available for streaming that generate royalties), to promote the array of their respective professional services offerings, and to generate leads, the majority of which were typically converted into paid engagements. From the time that the Disabled Accounts literally disappeared from public view, business leads and paid engagements have dropped precipitously. More importantly, for Lakefront, the need for injunctive relief is particularly critical as the absence of its Instagram account (that reaches more than 10,000 followers)[1] has left it unable to meaningfully promote its newest project, a feature length film in post-production stage, on which it was the Production Company. The inability to maintain a vigorous and sustained online promotional campaign via Lakefront's Instagram account leading up to the release date, has likely already adversely impacted the success of the film, to the point that the distributor of the film withheld advance payments contemplated under the distribution agreement. But the impact, risks and injury will also have considerable adverse downstream effects, straining Lakefront's relationship and goodwill with cast and crew who are being deprived of anticipated exposure, imperiling the repayment of and returns to investors, and diminishing the prospects that there will be back-end payments of net profits. Karum Decl. at ¶¶ 26-27, 31-35; *see also* Atkins Decl. at ¶¶ 18-22.

---

[1] Many followers of the Lakefront Instagram and Facebook accounts are, themselves, in the industry, and visit regularly for professional networking purposes and to identify potential upcoming opportunities to audition for cast and/or crew of a project. Karum Decl. at ¶ 27

## LEGAL ARGUMENT

This Honorable Court should grant Plaintiffs the limited immediate relief that it is requesting. And it really is not a close question.

### A.        The Applicable Legal Standard.

To prevail on a petition for a temporary and preliminary injunctive relief, the movant must demonstrate: (1) a reasonable likelihood of success on the merits of its claims; (2) that no adequate remedy at law exists; (3) that it will suffer irreparable harm if the requested relief is denied; (4) that the irreparable harm that Plaintiffs will suffer if relief is denied outweighs the harm to the Defendant if the relief is granted; and (5) that granting the relief will not harm the public interest. *See Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir. 2010). These elements are to be evaluated by the Court on a sliding scale; "the stronger the case on the merits, the less irreparable the harm must be shown." *Ty, Inc. v. GMA Accessories, Inc.,* 132 F.3d 1167, 1172 (7th Cir. 1997). Similarly, "[t]he more likely the plaintiff is to win, the less likely need the balance of harms weigh in his favor." *Coca-Cola Co. v. Alma-Leo U.S.A., Inc.,* 719 F. Supp. 725, 727 (N.D. Ill. 1989). As set forth below, Plaintiffs satisfy each of these elements, and their Motion should be granted.

### B.        The Relief Requested Is Necessary to Restore and Preserve the Status Quo Ante.

It is well settled that the general purpose of interim injunctive relief is to preserve the status quo. *Chicago United Indust., Ltd., v. City of Chicago,* 445 F.3d 940, 944 (7th Cir. 2006). It is equally clear, however, that the status quo is not marked by the time that suit was filed, rather it is the *status quo ante* that matters, which is the "last peaceable uncontested status existing between the parties *before the dispute developed."* *K.C. v. Individual Members of Med. Licensing Bd. of Indiana*, No. 23-2366, 2024 WL 1212700, at *3 (7th Cir. Mar. 21, 2024)(Jackson-Akiwumi, Circuit Judge, dissenting)(emphasis added) quoting 11A Charles Alan Wright, Arthur R. Miller &

Mary Kay Kane, Federal Practice and Procedure § 2948 (3d ed. 2023)("Status quo" does not mean the state of things the moment a party files suit; it means the "last peaceable uncontested status existing between the parties before the dispute developed.").

Although in this case, the Plaintiffs can certainly demonstrate that the status quo ante was a point prior to Defendant's decision to simply delete and erase all evidence of the Plaintiffs' credits and rights with respect to the Film, the temporary deprivation of those rights does not clearly threaten Plaintiffs immediate and irreparable harm. By striking contrast, however, as described below, Plaintiffs' inability to proximately access and use the Disabled Accounts poses a very real and immediate threat of irreparable injury that warrants the limited injunctive relief requested. Thus, for purposes of the Motion, the status quo ante should be viewed as the time immediately before the Accounts were disabled.

### C.        Plaintiffs Will Likely Succeed on the Merits of Their Copyright Claims.

There is more than a *reasonable l*ikelihood that Plaintiffs will likely succeed on the merits of all of their claims, although for purposes of this Motion, the focus will be on the copyright related claims against the Defendant, as to which Plaintiffs' legal position is exceedingly strong and as to which they believe they will prevail.

Defendant can rightfully claim credit for the *idea* for the general storyline of the Film. It is well settled, however, that ideas cannot be copyrighted. *See* 17 U.S.C.A. § 102(b)("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."). To the contrary, copyright protection is reserved for the person (or those) who translates an idea into a fixed, tangible medium.

To that end, Defendant executed a Production Agreement with Lakefront dated September 22, 2021, to turn her idea into a short film. It was Lakefront that prepared the initial draft of the

script, which was then revised and refined by Karum. That makes Lakefront the author of the script/screenplay as it was "work-for-hire" as that term is defined in 17 U.S.C.A. § 101 (and for good measure, the intern also expressly assigned any and all rights in her draft script to Lakefront on September 26, 2021). Defendant cannot claim that Lakefront's contributions were merely work-for-hire as she did not "employ" Lakefront, and nothing in the Production Agreement assigns any intellectual property rights to Defendant. Thus, contrary to Defendant's copyright application and takedown demands, Lakefront is the sole author of the script/screenplay, as evidenced by the copyright symbol on the final Production Draft of the script.

Similarly, Defendant's claims of authorship of the Film based upon the director's credit she claimed (and graciously received despite her well documented struggle as a first-time director) is also incorrect. A director's contributions to film did not constitute a work of authorship amenable to copyright protection. *see 16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2nd Cir. 2015). Instead, per the express provisions of the Production Agreement, it was Lakefront that was clearly and primarily responsible for creating and overseeing all aspects of the fixed, tangible expression of Defendant's idea into the actual Film. It bears repeating that nothing in the Production Agreement assigns any of Lakefront's intellectual property rights to Defendant. As a result, Lakefront is the principal (if not sole) author under the Copyright laws, 17 U.S.C. § 201(a), or at the very least, the Film was a "joint work," vesting in Lakefront no less than an equal copyright to audio-visual work (and again, sole copyright with respect to the script/screenplay). *See Janky v. Lake County Convention and Visitors Bureau*, 576 F.3d 356, 361 (7th Cir. 2009). As a matter of law, therefore, at the very least, Lakefront owns an "undivided interest" in the Film, at least equal to any that Defendant could possibly claim, and Lakefront may use or license its rights as it sees fit. *See id.,* (quoting *Erickson v. Trinity Theatre, Inc.,* 13 F.3d 1061, 1068 (7th Cir.1994). Thus, Karum and Atkins, as Lakefront's licensees, were similarly authorized and have every right to promote

Lakefront's role and considerable contributions to the finished product, as well as their own respective individual contributions to the project. In short, and contrary to Defendant's fraudulent assertions in her takedown notice, nothing about Plaintiffs' use or promotion of the Film and their considerable contributions to the Film were in any way unauthorized.[2]  Plaintiffs therefore easily meet the first element for obtaining injunctive relief.

### D. Plaintiffs Face an Immediate Threat of Irreparable Injury for Which There Is No Adequate Legal Remedy.

Plaintiffs, and in particular Lakefront, face an immediate threat of irreparable injury for which there is no adequate legal remedy.  As this District has recognized, "[t]he lines between the elements of no adequate remedy at law and irreparable harm tend to be blurry," and thus it is appropriate to consider these elements together.  *See Monfardini v. Quinlan,* 2003 WL 21384642, *2 (N.D. Ill. June 13, 2003).

"[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by such violations."  *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir. 1992).  *See also   See Am. Family Mut. Ins. v. Roth*, 2005 WL 3700232, *26 (N.D. Ill. Aug. 25, 2005)(the loss of clients and/or goodwill built up over time has been held to amount to irreparable harm).  The fact that the harm to Plaintiffs is ongoing in nature reinforces its irreparable nature.  *Applied Systems Inc., v. PBC Consulting Inc.,* 1:25-CV-14251, 2026 WL 381866, *6 (N.D. Ill. Feb. 11, 2026)("Where harm would be ongoing without a preliminary injunction, no adequate remedy at law exists.").

---

[2] But to reiterate again, Plaintiffs are *not* requesting as part of this Motion that any of the Subject Content be restored (an issue as to which Defendant can at least claim some interest) but rather simply that the reinstatement of the Disabled Accounts (an issue as to which Defendant has no legitimate interest), and prevention of further disabling of accounts.

Notably, Plaintiffs need not demonstrate concrete harm, specific injuries or business already lost to demonstrate irreparable harm. *See Hess Newmark, Owens Wolf, Inc. v. Owens,* 415 F.3d 630, 632 (7th Cir. 2005). Rather, "it is precisely the difficulty of pinning down what business has been *or will be lost* that makes an injury 'irreparable'." *Id.* (Emphasis added). The Seventh Circuit's holding in *Hess* is particularly instructive as it addressed the need for preliminary injunctive relief to enforce a restrictive covenant to prevent prohibited competition in the business of promoting motion pictures. In reversing the denial of the requested injunction for lack of evidence of lost business, the Court reasoned that: "a legal rule that irreparable injury can be established *only* by a concrete demonstration along the lines of 'we lost the [Tom Hanks' film] Philadelphia advertising business of Warner Bros. to [a rival] as a result of [Defendant's] work for our rival' would make injunctions useless as a practical matter." *Id.* (Emphasis in original). Indeed, the Court held that conduct that merely changed the probability of realizing future income was sufficient to demonstrate a threat of irreparable injury for which injunctive relief is warranted. *Id.* at 632-33 ("Competition changes probabilities: a [rival] with stronger east-coast offices may improve by 5% or 10% the chance of receiving particular business from a particular studio. Over many years with hundreds of movies being promoted in 50 or more major metropolitan areas, a 5% swing can represent a lot of business—but [Plaintiff] will not be able to identify which contracts slipped from its grasp."). *See also Life Spine v. Aegis Spine Inc.,* 8 F.4th 531, 546 (7th Cir. 2021)("identifying and quantifying lost business 'would be especially difficult' for [Plaintiff]. And we have held that 'it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable'...'")(quoting *Hess,* 415 F.3d at 632).

In this case, Plaintiffs have amply demonstrated the threatened and ongoing injury to goodwill, as well as the difficulty in ascertaining the degree of its lost business and lost opportunities that mount daily, thereby making its injuries plainly irreparable. This satisfies the

second and third elements, particularly on the sliding scale approach favored by this Circuit and District.

**E.      The Balance of Harms Tips Decidedly in Favor of Plaintiffs and Granting Interim Injunctive Relief.**

The balance of harms is entirely asymmetrical, weighing heavily in Plaintiffs' favor and in granting the limited injunctive relief requested in the Motion.  Contrary to the harm that Plaintiffs have already endured and with which they are threatened, there simply is no harm to Defendant in having the Disabled Accounts reinstated since the Subject Content will not be displayed or referenced on those Accounts.[3]  Similarly, there is no harm in precluding Defendant from issuing additional takedown notices since the Order assures that Plaintiffs will not re-post any of the Subject Content and are obligated to remove any such Content that to date has been overlooked.

**F.      The Injunctive Relief Requested Will Not Harm the Public Interest.**

Finally, while potential harm to the public interest can be a significant element in some cases, it generally has little (if any) application to private disputes.  *See Nano-Proprietary, Inc., v. Keesman,* 2007 U.S. Dist. LEXIS 7666, *20 (N.D. Ill. Jan. 30, 2007)("Because this is essentially a private contract dispute, the Court is not inclined to weigh the public interest here."). To be sure, however, the public interest would actually be served by restoring the Lakefront Instagram account, since many of its 10,000 + followers use it to network and identify opportunities to join the cast or crew of a project.  Accordingly, "public interest" weighs in favor of entering the limited injunctive relief requested.

---

[3]   Plaintiffs are mindful that interim injunctions requiring affirmative action are ordinarily disfavored, but in this case, affirmative conduct is the only means of restoring the status quo ante and requires exceedingly little of the Defendant.  As easy as it was for Defendant to send takedown notices to the various platforms, it should be just as easy to send follow-up notices to those platforms, advising that by agreement of the parties and/or Court order, that the Disabled Accounts should be reinstated.

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion should be granted, this Honorable Court should enter the proposed Order, schedule (if and as necessary) this matter for a preliminary injunction hearing (with accompanying expedited discovery), and award Plaintiffs such other relief as this Court deems just.

Respectfully submitted:

Dated: May 20, 2026

**LAKEFRONT PICTURES, LLC, JENNIFER KARUM and RYAN ATKINS**

By: ___/s/ *George J. Spathis*___
      One of their Attorneys

George J. Spathis (#6204509)
(gspathis@lplegal.com)
LEVENFELD PEARLSTEIN, LLC
120 S. Riverside Plaza, Suite 1800
Chicago, Illinois 60606
Phone: (312) 346-8380

14

15

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2026, I caused the foregoing pleading to be served on the following persons via electronic mail at the addresses listed below:


Steve Baron  sbaron@bhhlawfirm.com

Amanda Gecewicz  amg4894@gmail.com



_/s/ George J. Spathis_

15

# EXHIBIT A

## **DECLARATION OF JENNIFER A. KARUM**

Jennifer Karum, on oath, deposes and states as follows:

1.  I am over the age of 21, and competent to testify as to the matters set forth below based upon my personal knowledge.

2.  I am an actor, writer and producer.  I often use my maiden name (Goodman) in connection with acting engagements.

3.  I am a co-founder (with Ryan Atkins) of Lakefront Pictures, LLC ("LFP"), a Chicago-based production company.

4.  In or about the fall of 2021, I met with Amanda Gecewicz ("Amanda") with whom I had previously briefly worked about developing a short film (5-10 minutes) around an idea and story line that Amanda described.

5.  Amanda had limited experience in film making and I told her that LFP could take her idea and turn it into an actual film.

6.  We decided to work together and she executed a Production Agreement with LFP dated September 21, 2021 (the "Agreement") to produce the film titled *Blackhatter*, a true and correct copy of which is attached to my Declaration as Exhibit 1.

7.  Blackhatter was a low budget film that Amanda was ultimately self-financing, so LFP, Ryan and I agreed to accept payment that was below market, particularly given the comprehensive nature of our responsibilities under the Agreement.  For LFP, which was working towards building its portfolio, the Film credits and promotional exposure that were promised under the Agreement actually had greater value than the monetary compensation we were paid.

8.  To that end, nothing in the Agreement prohibited or restricted LFP, Ryan or me from promoting Blackhatter or our respective contributions to the film.  It is also important to note

that LFP did not assign any intellectual property rights to Amanda under the Agreement so as to assure we could promote and get valuable credit for our work.

9. LFP developed the script for Blackhatter. Because the film was quite short, we let Sarah Quinn, a paid LFP intern, prepare the first draft. While I believe that this qualified as work-for-hire, LFP separately paid her for any and all rights to the script (and so that she could claim script writing experience).

10. I revised and finalized the script. LFP did not transfer or assign any interest in the script/screenplay that it developed to Amanda. In fact, the final "Production Draft (which is only four pages long) that was circulated to Amanda, cast and crew bears an LFP copyright notice. A true and correct copy of the script is attached to my Declaration as Exhibit 2.

11. After the script was finalized, LFP prepared storyboards, developed character profiles, designed wardrobe mock-ups, scouted film locations, hired all cast and crew, and coordinated and supervised all of the filming, under LFP's direct supervision.

12. Filming was completed over a two-day period in mid-November 2021. Amanda wanted to direct the film, but as a first-time director, she needed a lot of direction and guidance. I arranged to have an experienced director join the crew and to mentor Amanda on set, but he was sick on the first day of filming, and Amanda ended up asking me to take over director's responsibility on the first day to keep the production on track and on budget.

13. LFP was involved in post-production work, and I think the final product was something we were all proud of. Ryan and I actively promoted LFP's work and its on-screen credit as the film's "Production Company."

14. I also was personally credited on-screen form my roles as Producer, Story Editor, Production Coordinator, Casting and as a Director Consultant. I believe I should have received a

co-director credit based upon the actual work I performed, but we ultimately agreed that Amanda could claim credit as the Director and I would get the Director Consultant credit.

15.     Ryan was credited as Producer, Director of Photography, Sound Designer and Colorist

16.     LFP, Ryan and I actively promoted the film and our work on it through respective social media accounts, and Amanda never expressed any objection.

17.     In fact, when Blackhatter won film festival awards (including, ironically, Amanda winning for best directing), Amanda effusively praised the entire team that LFP assembled and managed.

18.     Almost two years later, however, for reasons I do not understand, Amanda made disparaging public statements about me on social media.  When I reached out to understand why, she publicly (and falsely) accused me of bullying, stalking and harassing her (and harassing her family).

19.     In 2026, LFP, Ryan and I began receiving a wave of takedown notices Meta/Facebook, Instagram, Google, YouTube, WIX and Staff Me Up, sent pursuant to the Digital Media Copyright Act("DMCA") targeting any and all content related in any way to Blackhatter on our accounts.  The notices were prompted by complaints made by Amanda for what she claimed was our alleged unauthorized use of copyrighted materials over which she claimed "sole ownership."   To be clear, the content at issue had been actively and openly promoted on these platforms for years, before Amanada suddenly claimed it was unauthorized.

20.     Ryan and I eventually learned that Amanda applied for copyrights relating to Blackhatter claiming sole authorship of the "entire motion picture, direction, script/screenplay," and received —in her name alone— a series of Copyright Registrations: Number PAU 4173667

for the film; Number VAU001499795 for the film's visual materials; and Number TXU002363749 as dramatic work.

21. We also learned that Amanda created an updated version of Blackhatter that eliminated all credits to LFP (as Production Company), to me (as Producer, Story Editor, Production Coordinator, and Casting) and to Ryan (as Producer, Director of Photography, Sound Design and Colorist), which she used to replace the original film on which we had the extensive list of on-screen credits. The updated film is otherwise exactly the same as the original, except that our credits referenced above were just wiped away.

22. Amanda also wiped away our credits on a new promotional poster and from the IMDB listing for the film, in which she gave herself credits as a writer (although she knows of LFP's copyright as to the script) and the only producer (she made herself Executive Producer).

23. One of the takedown notices we received included the communication that was sent to the platform by Amanda, who did not bother to mention the Agreement or the credits on the original version of the film, promotion poster and IMDB listing.

24. We protested each of the takedown notices, but the platforms removed the subject content as to which Amanda had complained. Moreover, because Amanda sent multiple notices to each of the platforms, separately complaining about what she claimed were unauthorized uses of the film's title, video clips, still shots, and even behind the scenes photos taken personally by Ryan, Facebook, Instagram, Google, YouTube and WIX treated them as repeat offenses, and suspended or threatened to suspend our accounts.

25. With respect to Google, YouTube and WIX, we were able (at least initially) to avoid disabling (or get the quickly get the disabled accounts reinstated) by agreeing that the subject content would be removed (at least temporarily), but Lakefront's Instagram account and Ryan's

Facebook account remain disabled even though we agreed to remove the Blackhatter related content.

26. At the time it was disabled, LFP's Instagram account had more than 10,000 followers. LFP's Instagram account is its primary source of marketing and promotion. LFP uses it to promote the projects on which it is working, to the films that it has produced that are currently available for streaming (from which royalties are generated), and to promote the array of services it offers to actors (creating demo reels) and filmmakers (production and cinematic services). Instagram is also LFP's primary source of lead generation (prior to the disabling of the LFP Instagram account, LFP received 4-5 engagement inquiries per week, and converted 70-80% of those inquiries into paid engagements).

27. But since LFP's Instagram account has been disabled, no one can access it (including LFP), or find it through a search, even if the user was previously a follower or subscriber. Simply put, LFP's presence on Instagram—where it used to post almost daily—no longer exists and business leads and paid engagements have dropped precipitously. In fact, I have had followers (many of which are in the film business and visit to seek out opportunities to join the cast or crew of our projects) message me via my personal Instagram account or otherwise reach out to ask about LFP's account, and whether LFP is still in business.

28. LFP, Ryan and I submitted counter-notices under the DMCA in accordance with 17 U.S.C. § 512(g), pursuant to which our accounts should have been reinstated and the subject content should have been restored. Instagram and Facebook, however failed to reinstate the disabled accounts, or even respond until recently, when it advised us that we have to resolve this with Amanda.

29. Accordingly, through our counsel, we requested that Amanda merely agree to the reinstatement of the LFP Instagram account and Ryan's Facebook account (without admitting any wrongdoing) and expressly agreed that the Blackhatter related content would *NOT* need to be restored while this dispute remained pending.

30. Amanda, however, expressly refused, and even sent at least one new takedown notice to WIX which hosts my personal website where I promote my services as an actor and producer (there were no clips or stills on my website although there may have been a resume that included the title Blackhatter among my credits). Not surprisingly, Amanda's notice to WIX did not mention the Agreement or the pending action against her for her fraud on the US Copyright Office, and bad faith submission of takedown notices.

31. The timing of Amanda's purposeful interference could not have been more damaging. In particular, LFP's loss of its Instagram account has left it unable to promote its newest project, a feature length film it produced called *A Snowbound Christmas* which is post-production stage, and which we would have been promoting daily on Instagram to LFP's followers (many of which share and increase reach of LFP's posts).

32. We have an Instagram account under the name "Lakefront Creative Group" but that account has only 488 followers, and is geared toward corporate video work, making it an inadequate substitute for the LFP's main account.

33. In an effort to generate inquiries and leads for demo reel services from aspiring actors (which have dried up since the LFP Instagram account has been disabled), we also created an account called "Lakefront Actor Reels," but that account has fewer than 250 followers, so it is completely inadequate for marketing our new movie.

34.     The inability to maintain a sustained online promotional campaign on Instagram leading up to the premiere and release of the new film has already threatened the success of the film.  Among other things, LFP is contractually obligated to its distributor to promote the film on social media, but cannot do so on its most effective platform, and the distributor withheld the second instalment payment (until today). Ryan and I are concerned that the distributor may similarly withhold the next installment payment unless we can get the Instagram account reinstated and begin the systematic promotion that the distributor requires.

35.     Beyond tensions with the distributor, there will also be downstream injury, including strained relationships and lost goodwill with cast and crew who are being deprived of anticipated exposure, uncertainty as to the ability to and/or timing of repaying the film's investors, and diminishing prospects that the film will reach its projected revenue targets and make back-end payments of net profits to investors, cast and crew.

36.     Amanda's newest takedown notice resulted in WIX disabling my website yesterday today (May 18th), cutting off yet another avenue for promoting our new film, and interfering with my ability to market my services as an actor and producer.

**I state under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.**

_____

**JENNIFER KARUM**

**Dated: May 18, 2026**

# EXHIBIT 1



<u>PRODUCTION AGREEMENT</u>

THIS AGREEMENT dated on September 21, 2021, is between Lakefront Pictures, LLC, Ryan Atkins & Jennifer Karum, Chicago, Illinois ("Producers") and Amanda Gecewicz, ("Owner") at 20813 Lone Pine Ct, Deer Park, IL 60010 for the Short film "Blackhatter" ("project"), and this agreement is entered into effect as of September 22, 2021. The Producers and Owner intend to produce Owner's Short Film, Blackhatter.

**ACCORDINGLY, IT IS AGREED AS FOLLOWS:**

1. Amanda Gecewicz has agreed to hire Lakefront Pictures, LLC as the Production Company for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Lakefront Pictures, LLC, in the amount of $7,000 which will include a line item of payment toLakefront Pictures, as well as remaining funds to a seperate bank account under Lakefront Pictures to produce the project, and will provide Lakefront IMDB credit, First Position Title Credit with Lakefront Pictures animated logo on both intro and outro credits, and agrees to promote Lakefront Pictures as the Production Company on any and all Publicity relating to "Blackhatter" in perpetuity.

2. Amanda Gecewicz has also agreed to hire Ryan Atkins and Jennifer Karum as the main Producers for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Jennifer Karum and Ryan Atkins allocated in the budget for Producer roles, along with providing individual IMDB credit, Single Card Title Second and Third Position in the Opening Titles of the Film and outro credits, and agree to promote Ryan Atkins and Jennifer Karum as the Producers on any and all Publicity relating to "Blackhatter" in perpetuity.

3. In addition, Amanda Gecewicz agrees to pay Lakefront Pictures, LLC $7,000 which includes cost to cover hiring personnel, securing locations, on-set insurance, food, catering, and anything necessary to produce the project. Amanda is aware that should Lakefront deem a need for further funds, Lakefront Pictures will notify Amanda and provide detailed information for such a request. Honoring the request for additional funds will be at Amanda Gecewicz's full discretion understanding it may impact the success of her film.

4. Producers agree to provide film knowledge, consulting services, hire crew, and provide support to the best of their ability to Owner.

5. Producers will put together deadlines, and information to best help and position Amanda Gecewicz for success to the best of their ability.

6. Producers will be on set every day of filming to guide the process and provide services and will be paid for their time on set. Should they not be able to be on set for any reason, they will provide written documentation via email of dates they cannot be on set. Medical emergencies, and family related emergencies will be excused and will not impede on production.

7. Amanda understands producers will be actively assisting to ensure directing captures the best footage but also maintains a smooth operation ensuring no hinderance on set. Amanda agrees to be amicable and open to adjustments deemed necessary by Producers for a successful completion of the project.

8. Ryan Atkins and Jennifer Karum and Lakefront Pictures, LLC will be attached to the project from Development through all post-production, festival submissions, distribution pitches and up and through negotiations for distribution, should there be such conversation.

9. In the event of separation, Producers and Production Company will be paid up to services provided, and given credit on IMDB and in credits of movie for positions fulfilled. If Development work is completed, the Lakefront Pictures animated Logo will be used regardless of any separation for "Blackhatter." along with IMDB credit, and payment agreements. No refunds will be provided once deposit is made.

10. Amanda Gecewicz authorizes Producers to hire crew, bring on teams to provide services for the filming of "Blackhatter," and to hire vendors necessary for filming.

11. Amanda agrees to provide minimum ½ of the budget payable to Lakefront Pictures in order for Lakefront Pictures to provide services at the time of signed agreement for production purposes in the amount of $3,500. If Amanda does not provide ½ the budget to Lakefront Pictures, LLC she will provide debit cards and proof of funds to Lakefront Pictures with access for Lakefront Pictures to ensure monies are available at any given time. In the event only ½ the funds are provided at time of signing, any additional funds not provided that result in overdraft charges will not be liability or responsibility of Lakefront Pictures, LLC and no payment will be expected from Lakefront Pictures, now or in the future.

12. Amanda understands that agreements with hired personnel will be in written contract between Amanda Gecewicz, or a formed LLC with Amanda as owner, and in signing confirms that Lakefront Pictures is only



acting on behalf of Amanda, her LLC if she chooses to create one; solely to administer paperwork for crew, and pay agreed upon payments to freelancers for the project. In the case that Amanda doesn't provide full payment to Lakefront Pictures, LLC to administer funds to personnel, Lakefront Pictures will not be held responsible or held liable to any 3rd party and is free and clear of any legal liability now or in the future.

- Amanda agrees that Lakefront Pictures, LLC and its members are only responsible for funds administered to Lakefront Pictures and only liable for funds in their possession related to agreed services for freelancers.

13. All contracts for actors, agents and freelancers will be with Amanda Gecewicz or her LLC, and Lakefront Pictures, LLC will not be liable for contracts regardless of Lakefront Pictures acting on behalf of Amanda, or any LLC formed and Lakefront Pictures, LLC will not be liable for any financial obligations to freelancers outside of agreed contracts between Owner and freelancer and Owner and vendor.

- Any lawyer fees, due to additional lawyer written contracts, or agreements related to crew, locations and filming, separate than what Lakefront Pictures provides, will be funded and provided by Owner in addition to $8,900 should legal be deemed necessary.

14. Amanda may be asked to provide insurance for set

15. Ananda may be asked to provide stunt coordinators for safety of actors and crew

16. Amanda agrees to a line item in the budget in the amount of $1,200 to hire Lakefront Pictures to produce the picture, not including additional line item should the film receive risiduals, profits and the like.

17. Any additional Producers Owner brings to the project, outside investors attachment, will need written approval by Producers along with agreement in writing.

18. Owner agrees to weekly communications on any and all updates/progress reports in regards to Development, Pre-Production, Production and pitching the film, along with any feedback that comes from potential licensees/studios/recipients/investors/festivals.

- Owner agrees to inform Producers of any network deal, distributor or 3rd party licensing in writing and agrees to attach Producers to the pitch to any 3rd parties. Producers understand there is no guarantee of future attachment from any network, studio or acquisition.

19. Lakefront Pictures, LLC, Ryan Atkins and Jennifer Karum will be in any and all pitch materials, publicity, marketing, social media and press kits for Blackhatter, or any name under the current story with the previous title Blackhatter.

- Upon Sale, acquisition or partnership, each Producer is entitled to 3% of Producer's Share Pro Rata pari passu with all Producers on the project.
- Lakefront Pictures, LLC will have a line item in the budget of 3% to be paid at the time of acquisition or buyout on top of $1,200 line item in budget.

20. Producers agree to not slander, deter, or else negatively influence others' decisions or participating individuals whether fact or opinion in perpetuity. Amanda agrees to not slander Producers or Lakefront Pictures whether deemed fact or opinion in perpetuity.

21. Producers are aware "Blackhatter" will be sharing proprietary storylines, future storylines and pitch materials, along with any additional marketing materials in association with the project. Producers agree to not utilize concept ideas with any 3rd party to produce the story, without written consent permission from Amanda Gecewicz.

22. Provided that Amanda Gecewicz and her team receive distribution, or a studio acquisition, on top of 3% Lakefront Pictures, LLC will receive 5% of the pro-rata share of Producer funds, and will be attached to any future project, as long as the studio agrees. Contracts will be negotiated at time of offer.

23. Producers, Ryan Atkins and Jennifer Karum will be invited to the premiere events, festivals, publicity events and pitch meetings related to "Blackhatter" and depending on Amanda Gecewicz's budget, Amanda will make every effort, in good faith, to pay for Jennifer Karum and Ryan Atkins of Lakefront Pictures to be present, including covering any hotel costs, flight, per diem and food. However it is agreed between the parties, Sundance, SXSW, Cannes or any international will be paid for in full for Jennifer Karum and Ryan Atkins.

- Should Amanda not be in a position to pay for Jennifer Karum and Ryan Atkins, to attend meetings or festivals there will be a deferred payment of the cost if and when Blackhatter makes net profit.
- Amanda will inform Jennifer Karum and Ryan Atkins of all festivals she applies to, and it will be a separate budget from the $7,000 that the funds for submissions come from



- Amanda will ensure that Jennifer Karum and Ryan Atkins are aware of all flights and hotels Amanda books in effort to assist in providing them sufficient details for booking should Jennifer Karum and Ryan Atkins attend any festivals or pitch meetings.

24. Indemnity / Insurance. Company shall indemnify and hold harmless Producers from and against any claims, liabilities, costs or other amounts (including reasonable legal fees and costs) suffered by Producers in connection with the development, financing, production, marketing and/or exploitation of the film, excluding any matter arising out of Producer's gross negligence, willful misconduct and/or intentional violations of the terms of this Agreement. Producers will at all times be named as an additional insured party on general liability and errors and omissions insurance policies maintained by the Company in connection with distribution, exploitation, advertising and promotion of the Film. Such insurance coverage to extend through at least the second (2nd) annual anniversary of the initial commercial exploitation of the Short.

25. Filming dates scheduled for Nov 12th weekend and should it change, Producers must be notified snd dates agreed upon herein.

26. In signing the agreement below, Amanda Gecewicz agrees to pay $3,500 down payment for sign-on development to Lakefront Pictures, LLC which includes services provided herein by Lakefront Pictures and in addition, $3,500 by Oct 15 for the purpose of pre-production, production, and editing. Amanda is aware, should Lakefront Pictures be asked to provide specific editor, or post-sound or color requests, budget may change and more funds may be needed to meet such requests. As it stands, the color and sound will be included in this rate unless specific request for additional workshop of sound and color is requested.

This agreement is valid through Wednesday Sept 22, 2021, at 5 PM

Both parties enter and agree to the terms

**9/21/2021**

_____
Owner(s) Signature of Lakefront Pictures, LLC

_____
Date

_____
Owner Signature of Amanda Gecewic

9/21/21
_____
Date

# EXHIBIT 2

Blackhatter


by


Amanda Gecewicz &
Sarah Quinn

Story Editor:
Jennifer Karum

Produced by
Lakefront Pictures LLC

Production Draft

ii

Lakefront Pictures LLC
Chicago IL
©2021

Production Draft  The Blackhatter  REV Final 10/22/21      1.


INT. CONVENIENCE STORE - NIGHT

Rows of shelves line your average, fluorescent-lit
convenience store.  **DREW**, mid-30s, casually strolls down the
aisle.

He pauses and plucks a sucker off a display and pops it into
his mouth then tosses the wrapper on the ground. He continues
down the aisle.

At the far end of the store, out of sight of the register,
he glances at **PETER**, 60s, the cashier.  Peter is busy ringing
up a frazzled looking mother, **LISA.**

Drew reaches behind him and brings out a GUN. He checks to
make sure it's loaded and tucks it back into his waistband.
He starts down the other side of the aisle and stops.

In the aisle is a young girl. **CLAIRE**, 10, blocks his path.
She is watching him disapprovingly.

Drew attempts to ignore her and pretends to peruse the aisle.

There's a display of cheap sunglasses.  He tries on a pair.
Claire just keeps watching him intently.

> DREW
> Your mom ever teach you it's rude
> to stare, kid?

> CLAIRE
> You have to pay for that.

Drew rolls his eyes and pops the sucker out of his mouth
obnoxiously.

> DREW
> (mocking)
> For what?

> CLAIRE
> That and those! You have to pay for
> it.

> DREW
> Yeah, yeah. Someone will. Run back
> to your mom now.

He turns back, checks himself out in the small display
mirror, slides the glasses down his nose, and winks at
himself. He adjust the mirror--

Production Draft   The Blackhatter   REV Final 10/22/21          2.

**THE BLACKHATTER,** ambiguous, open age, pops into the reflection directly behind him in the next row over. Wearing a black hat and a long black coat, he stares at Drew.

A startled Drew whips around, dropping the sucker, to find no one behind him.

> CLAIRE
> Are you going to pay for that now?

Drew is a little shaken but snaps out of it when the girl speaks.

> DREW
> Here, I'll tell you what-

He reaches into his pocket and pulls out a crumpled dollar.

> DREW (CONT'D)
> I'll pay *you* to go away.  How 'bout that, kid?

He gives her a fake-cheesy asshole smile and puts the sunglasses on top of his head. He gives her the bill as he shoves past her to get to the counter.

He gets in line behind Lisa.  Her purchase consists of simple basics: some cheap food, diapers, and toilet paper.  She fumbles with change.

Claire walks up, puts a candy bar on the counter, and looks up at her mom.

> LISA
> Claire...no.  We can't afford that, put it back.

A disappointed Claire takes the candy back and puts it away.

Back to Lisa--

> LISA (CONT'D)
> (to Peter)
> Uh, and a scratcher. Please.

Drew snorts at Lisa's carelessness. Lisa turns to glare at him.

> LISA (CONT'D)
> Excuse me?

> DREW
> Just pick up the pace, sweetheart, will ya? I don't have all day.

Production Draft  The Blackhatter  REV Final 10/22/21          3.

Peter hands her a LOTTERY TICKET.

Drew rolls his head, bored and impatient, and looks out the window--

He freezes.

The **BLACKHATTER** stands outside the window, watching.

Drew gaze fixes on the figure outside the window.

> PETER
> (to Drew)
> Sir?

Drew can't tear his eyes away.

> PETER (CONT'D)
> Er..sir?

Drew snaps his gaze to the cashier and back to the window.

The Blackhatter is gone.

> PETER (CONT'D)
> Can I help you with something?

Drew still on edge, shakes his head to clear his mind.

This is business.

> DREW
> Yeah, you can help me.

Drew draws his gun and points it at Peter.

> DREW (CONT'D)
> Open the register.

                                                    CUT TO:

EXT. CONVENIENCE STORE- NIGHT

Outside the convenience store it is calm until-

BANG. BANG.

A FLASH.

A SCREAM.

Drew burst out of the door into the night.  He is frantic and distressed. Something big went down.

Production Draft  The Blackhatter  REV Final 10/22/21        4.

> DREW
> No...no no.

Faintly, sirens begin to approach. He looks around and takes off down the street.

EXT. ALLEY- SHORTLY AFTER

Drew turns the corner sharply and stops. He has been running. At the end of the street is Claire.  He takes a few steps towards her.

> DREW
> Kid, I-

There is a big blood stain on her shirt - like she's been shot.  Behind her, at the end of the street, the Blackhatter watches them.

> CLAIRE
> (weakly)
> You have to pay for that.

She staggers towards him.   She collapses into his arms.

> DREW
> Kid! KID! Come on, don't do this.

He looks down the street to where the Blackhatter stands.

> DREW (CONT'D)
> Do something! Please.

The Blackhatter considers him.  He outstretches one hand, then the other. Weighs them up and down, scales tipping. He is making a judgment.  A decision is made. The Blackhatter looks back at drew, tips his hat, and walks away.

Back to Drew. Now he lies on the ground, Claire kneels over him.  He tries to talk and gurgles on blood. He's the one that's been shot now. The deal is complete.  Claire looks down on him, sadness and fear on her face.

> CUT TO BLACK.

# EXHIBIT B

## **DECLARATION OF RYAN ATKINS**

Ryan Atkins, on oath, deposes and states as follows:

1. I am over the age of 21, and competent to testify as to the matters set forth below based upon my personal knowledge.

2. I have background in cinematography. I am a co-founder, member and manager of Lakefront Pictures, LLC ("LFP"), a Chicago-based production company. Jennifer Karum is the other member and manager of LFP.

3. Lakefront, Jennifer and I worked on a short film called *Blackhatter*. Amanda Gecewicz came with the idea for the film, and she hired us turn her idea into a movie, executing a Production Agreement with LFP dated September 21, 2021 (the "Agreement")

4. LFP developed the script for Blackhatter. An intern prepared the first draft, and Jennifer revised and finalized the script.

5. I prepared storyboards, developed character profiles, designed wardrobe mock-ups, scouted film locations. LFP hired all cast and crew, and coordinated and directly supervised all of the filming.

6. LFP was involved in post-production work, and I added the on-screen credits— including those to which LFP, Jennifer and I were contractually entitled under the Agreement-- and sent the proposed final cut to Amanda which she approved. The approved version credited LFP as the Production Company, Jennifer was personally credited as Producer, Story Editor, Production Coordinator, Casting and as Director Consultant, and I was personally credited as Producer, Director of Photography, Sound Designer and Colorist

7. LFP, Jennifer and I actively promoted the film and our work on it through various respective social media accounts we control, and Amanda never expressed any objection.

8.     In 2026, we began receiving a wave of takedown notices from Meta/Facebook, Instagram, Google, YouTube, WIX and Staff Me Up, sent pursuant to the Digital Media Copyright Act("DMCA") targeting content related *in any way* to Blackhatter on these.

9.     We learned that the notices resulted from complaints by Amanda for what she claimed was our alleged unauthorized use of copyrighted materials over which she now was claiming "sole ownership."   Tellingly, all of the referenced materials had been openly promoted on these various platforms for two years, and I believe that Amanda was fully aware of this and never even hinted at the time that she took issue with any of it (and in fact, I believe she benefited from the exposure).

10.     Jennifer and I then earned that Amanda applied for copyrights falsely claiming sole authorship of the "entire motion picture, direction, script/screenplay," somehow ignoring our Agreement and all of the work that LFP, Jennifer and I contributed to turn her idea into an actual movie.

11.     Even worse, and the clearest evidence that Amanda is acting in bad faith and with malicious intent, she created an "updated version" of Blackhatter, but the only changes she made were to eliminate all credits to LFP as Production Company, to Jennifer as Producer, Story Editor, Production Coordinator, and Casting, and to me s Producer, Director of Photography, Sound Design and Colorist.   These were credits that she approved and that existed for two years, before she unilaterally erased them without warning and in blatant disregard of the Agreement that she signed.

12.     Jennifer and I protested each of the takedown notices, but the platforms either removed the subject content or directed us to remove the content (which we did).

13.     But because Amanda sent multiple notices to each of the platforms (he sent separate notices alleging unauthorized use of video clips, unauthorized use of still shots, unauthorized

mentions of title Blackhatter, and even unauthorized use of behind the scenes photos that I personally took, Facebook, Instagram, Google, YouTube and WIX treated them as separate repeated offenses, and  suspended or threatened to suspend our accounts.

14.     With respect to Google, YouTube and WIX, we were able (at least initially) to avoid disabling (or get the quickly get the disabled accounts reinstated) by agreeing that the subject content would be removed.

15.     But Lakefront's Instagram account and my Facebook account remain disabled to this day, even though we agreed to remove the Blackhatter related content.

16.     We submitted multiple counternotices under the DMCA (both ourselves and through counsel), pursuant to which I believe that the accounts should have been reinstated and the Blackhatter content should have been restored.  But Instagram and Facebook, without further explanation, recently advised that our "Appeal" had been denied, and that the onus is on us to resolve this matter with Amanda who has shown absolutely no interest in resolving this issue.  In fact, she keeps sending more takedown notices even after we sued her.

17.     In an effort to find any common ground, we proposed a partial resolution (communicated by our counsel to Amanda's counsel), requesting that Amanda merely agree to the reinstatement of the LFP Instagram account and my Facebook account, without admitting any wrongdoing, and without restoring any of the Blackhatter related content.  Amanda refused, leaving us no meaningful alternative but to seek the Court's assistance.

18.     LFP's Instagram account had more than 10,000 followers, and it is our primary source of marketing and promotion.  LFP uses its Instagram account to promote the films that it has produced that are available for streaming (and generating streaming royalties), to promote current and upcoming project, and to promote our services to actors and filmmakers.  Since the

LFP Instagram account was reinstated, we have generated few leads and have experienced a substantial decline in revenues.

19.     LFP's loss of its Instagram account has left us unable to promote our newest project, *A Snowbound Christmas,* which is currently in post-production stage, and which we should be promoting on a daily basis over social media to build a "buzz" well in advance of its release (which is common and expected in the industry).

20.     Every day that goes by without the ability to promote *A Snowbound Christmas* to the more than 10,000 followers of LFP's Instagram account is a lost opportunity, threatening our standing and reputation with the film's distributor, its investors, and its cast and crew, and reducing the profit potential of the film and our ability to distribute "back end" profits.

21.     No other LFP social media account comes even close to the reach and effectiveness than that of the disabled Instagram account.

22.     Facebook's refusal to reinstate my personal Facebook account, which I use to promote my background and expertise in cinematography, has also directly and adversely impacted LFP.  I am the administrator of the LFP Facebook page, and because I cannot access my personal Facebook account, I cannot log-in as the LFP account admin, preventing LFP from doing anything with that account.

**I state under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.**

**RYAN ATKINS**

**Dated: May 19, 2026**

# EXHIBIT C



<u>PRODUCTION AGREEMENT</u>

THIS AGREEMENT dated on September 21, 2021, is between Lakefront Pictures, LLC, Ryan Atkins & Jennifer Karum, Chicago, Illinois ("Producers") and Amanda Gecewicz, ("Owner") at 20813 Lone Pine Ct, Deer Park, IL 60010 for the Short film "Blackhatter" ("project"), and this agreement is entered into effect as of September 22, 2021. The Producers and Owner intend to produce Owner's Short Film, Blackhatter.

**ACCORDINGLY, IT IS AGREED AS FOLLOWS:**

1.  Amanda Gecewicz has agreed to hire Lakefront Pictures, LLC as the Production Company for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Lakefront Pictures, LLC, in the amount of $7,000 which will include a line item of payment toLakefront Pictures, as well as remaining funds to a seperate bank account under Lakefront Pictures to produce the project, and will provide Lakefront IMDB credit, First Position Title Credit with Lakefront Pictures animated logo on both intro and outro credits, and agrees to promote Lakefront Pictures as the Production Company on any and all Publicity relating to "Blackhatter" in perpetuity.

2.  Amanda Gecewicz has also agreed to hire Ryan Atkins and Jennifer Karum as the main Producers for her short Film, "Blackhatter," filming in Chicago, Illinois and will provide payment to Jennifer Karum and Ryan Atkins allocated in the budget for Producer roles, along with providing individual IMDB credit, Single Card Title Second and Third Position in the Opening Titles of the Film and outro credits, and agree to promote Ryan Atkins and Jennifer Karum as the Producers on any and all Publicity relating to "Blackhatter" in perpetuity.

3.  In addition, Amanda Gecewicz agrees to pay Lakefront Pictures, LLC $7,000 which includes cost to cover hiring personnel, securing locations, on-set insurance, food, catering, and anything necessary to produce the project. Amanda is aware that should Lakefront deem a need for further funds, Lakefront Pictures will notify Amanda and provide detailed information for such a request. Honoring the request for additional funds will be at Amanda Gecewicz's full discretion understanding it may impact the success of her film.

4.  Producers agree to provide film knowledge, consulting services, hire crew, and provide support to the best of their ability to Owner.

5.  Producers will put together deadlines, and information to best help and position Amanda Gecewicz for success to the best of their ability.

6.  Producers will be on set every day of filming to guide the process and provide services and will be paid for their time on set. Should they not be able to be on set for any reason, they will provide written documentation via email of dates they cannot be on set. Medical emergencies, and family related emergencies will be excused and will not impede on production.

7.  Amanda understands producers will be actively assisting to ensure directing captures the best footage but also maintains a smooth operation ensuring no hinderance on set. Amanda agrees to be amicable and open to adjustments deemed necessary by Producers for a successful completion of the project.

8.  Ryan Atkins and Jennifer Karum and Lakefront Pictures, LLC will be attached to the project from Development through all post-production, festival submissions, distribution pitches and up and through negotiations for distribution, should there be such conversation.

9.  In the event of separation, Producers and Production Company will be paid up to services provided, and given credit on IMDB and in credits of movie for positions fulfilled. If Development work is completed, the Lakefront Pictures animated Logo will be used regardless of any separation for "Blackhatter." along with IMDB credit, and payment agreements. No refunds will be provided once deposit is made.

10. Amanda Gecewicz authorizes Producers to hire crew, bring on teams to provide services for the filming of "Blackhatter," and to hire vendors necessary for filming.

11. Amanda agrees to provide minimum ½ of the budget payable to Lakefront Pictures in order for Lakefront Pictures to provide services at the time of signed agreement for production purposes in the amount of $3,500. If Amanda does not provide ½ the budget to Lakefront Pictures, LLC she will provide debit cards and proof of funds to Lakefront Pictures with access for Lakefront Pictures to ensure monies are available at any given time. In the event only ½ the funds are provided at time of signing, any additional funds not provided that result in overdraft charges will not be liability or responsibility of Lakefront Pictures, LLC and no payment will be expected from Lakefront Pictures, now or in the future.

12. Amanda understands that agreements with hired personnel will be in written contract between Amanda Gecewicz, or a formed LLC with Amanda as owner, and in signing confirms that Lakefront Pictures is only



acting on behalf of Amanda, her LLC if she chooses to create one; solely to administer paperwork for crew, and pay agreed upon payments to freelancers for the project. In the case that Amanda doesn't provide full payment to Lakefront Pictures, LLC to administer funds to personnel, Lakefront Pictures will not be held responsible or held liable to any 3rd party and is free and clear of any legal liability now or in the future.

- Amanda agrees that Lakefront Pictures, LLC and its members are only responsible for funds administered to Lakefront Pictures and only liable for funds in their possession related to agreed services for freelancers.

13. All contracts for actors, agents and freelancers will be with Amanda Gecewicz or her LLC, and Lakefront Pictures, LLC will not be liable for contracts regardless of Lakefront Pictures acting on behalf of Amanda, or any LLC formed and Lakefront Pictures, LLC will not be liable for any financial obligations to freelancers outside of agreed contracts between Owner and freelancer and Owner and vendor.

- Any lawyer fees, due to additional lawyer written contracts, or agreements related to crew, locations and filming, separate than what Lakefront Pictures provides, will be funded and provided by Owner in addition to $8,900 should legal be deemed necessary.

14. Amanda may be asked to provide insurance for set

15. Ananda may be asked to provide stunt coordinators for safety of actors and crew

16. Amanda agrees to a line item in the budget in the amount of $1,200 to hire Lakefront Pictures to produce the picture, not including additional line item should the film receive risiduals, profits and the like.

17. Any additional Producers Owner brings to the project, outside investors attachment, will need written approval by Producers along with agreement in writing.

18. Owner agrees to weekly communications on any and all updates/progress reports in regards to Development, Pre-Production, Production and pitching the film, along with any feedback that comes from potential licensees/studios/recipients/investors/festivals.

- Owner agrees to inform Producers of any network deal, distributor or 3rd party licensing in writing and agrees to attach Producers to the pitch to any 3rd parties. Producers understand there is no guarantee of future attachment from any network, studio or acquisition.

19. Lakefront Pictures, LLC, Ryan Atkins and Jennifer Karum will be in any and all pitch materials, publicity, marketing, social media and press kits for Blackhatter, or any name under the current story with the previous title Blackhatter.

- Upon Sale, acquisition or partnership, each Producer is entitled to 3% of Producer's Share Pro Rata pari passu with all Producers on the project.
- Lakefront Pictures, LLC will have a line item in the budget of 3% to be paid at the time of acquisition or buyout on top of $1,200 line item in budget.

20. Producers agree to not slander, deter, or else negatively influence others' decisions or participating individuals whether fact or opinion in perpetuity. Amanda agrees to not slander Producers or Lakefront Pictures whether deemed fact or opinion in perpetuity.

21. Producers are aware "Blackhatter" will be sharing proprietary storylines, future storylines and pitch materials, along with any additional marketing materials in association with the project. Producers agree to not utilize concept ideas with any 3rd party to produce the story, without written consent permission from Amanda Gecewicz.

22. Provided that Amanda Gecewicz and her team receive distribution, or a studio acquisition, on top of 3% Lakefront Pictures, LLC will receive 5% of the pro-rata share of Producer funds, and will be attached to any future project, as long as the studio agrees. Contracts will be negotiated at time of offer.

23. Producers, Ryan Atkins and Jennifer Karum will be invited to the premiere events, festivals, publicity events and pitch meetings related to "Blackhatter" and depending on Amanda Gecewicz's budget, Amanda will make every effort, in good faith, to pay for Jennifer Karum and Ryan Atkins of Lakefront Pictures to be present, including covering any hotel costs, flight, per diem and food. However it is agreed between the parties, Sundance, SXSW, Cannes or any international will be paid for in full for Jennifer Karum and Ryan Atkins.

- Should Amanda not be in a position to pay for Jennifer Karum and Ryan Atkins, to attend meetings or festivals there will be a deferred payment of the cost if and when Blackhatter makes net profit.
- Amanda will inform Jennifer Karum and Ryan Atkins of all festivals she applies to, and it will be a separate budget from the $7,000 that the funds for submissions come from



- Amanda will ensure that Jennifer Karum and Ryan Atkins are aware of all flights and hotels Amanda books in effort to assist in providing them sufficient details for booking should Jennifer Karum and Ryan Atkins attend any festivals or pitch meetings.

24. Indemnity / Insurance. Company shall indemnify and hold harmless Producers from and against any claims, liabilities, costs or other amounts (including reasonable legal fees and costs) suffered by Producers in connection with the development, financing, production, marketing and/or exploitation of the film, excluding any matter arising out of Producer's gross negligence, willful misconduct and/or intentional violations of the terms of this Agreement. Producers will at all times be named as an additional insured party on general liability and errors and omissions insurance policies maintained by the Company in connection with distribution, exploitation, advertising and promotion of the Film. Such insurance coverage to extend through at least the second (2nd) annual anniversary of the initial commercial exploitation of the Short.

25. Filming dates scheduled for Nov 12th weekend and should it change, Producers must be notified snd dates agreed upon herein.

26. In signing the agreement below, Amanda Gecewicz agrees to pay $3,500 down payment for sign-on development to Lakefront Pictures, LLC which includes services provided herein by Lakefront Pictures and in addition, $3,500 by Oct 15 for the purpose of pre-production, production, and editing. Amanda is aware, should Lakefront Pictures be asked to provide specific editor, or post-sound or color requests, budget may change and more funds may be needed to meet such requests. As it stands, the color and sound will be included in this rate unless specific request for additional workshop of sound and color is requested.

This agreement is valid through Wednesday Sept 22, 2021, at 5 PM

Both parties enter and agree to the terms

9/21/2021

_____

Owner(s) Signature of Lakefront Pictures, LLC          Date

_____

Owner Signature of Amanda Gecewic          Date          9/21/21

# EXHIBIT D

## George J. Spathis

| | |
|---|---|
| **From:** | Jennifer Goodman <jennifer@lakefrontpictures.com> |
| **Sent:** | Monday, May 4, 2026 3:29 PM |
| **To:** | George J. Spathis; Ryan Atkins |
| **Subject:** | Fwd: Copyright Appeal Form #948057724663235 |

Jennifer A. Karum | Co-Founder | Producer | Actress

Inline image
 Co-Founder l Producer l Writer
Lakefront | Conrad Website | Conrad FB | FORBES | Conrad on WGN

Sent from my iPad

Jennifer on mobile; please excuse any and all brevities

---------- Forwarded message ---------
From: **'Facebook' via Lakefront Pictures, LLC** <llc@lakefrontpictures.com>
Date: Mon, May 4, 2026 at 3:28 PM
Subject: Copyright Appeal Form #948057724663235
To: <Llc@lakefrontpictures.com>

Thank you for contacting us. Based on the information you provided in your appeal, we cannot restore your content. We recommend that you contact the party that reported your post to resolve the issue directly with them. If an agreement is reached to restore the content to the site, please have the complaining party withdraw their complaint through an appropriate channel.

If you have any other questions, please visit the Intellectual Property section of the Help Center:
https://www.meta.com/help/policies/3234337743488413/?ref=cr

This decision was made by our technology.

Thanks,
Meta
>On Mon May 4, 2026 13:27:43, Jennifer Karum wrote:
>Email address : Llc@lakefrontpictures.com
>Please provide URL(s)/description leading to where the content appeared on Facebook. : We don't know what you're claiming!

1

>Your name (name and surname) : Jennifer
>Report number : 1979462166780084
>Please explain why you believe the content should not have been removed. The rights holder who filed the complaint against the content you posted will be provided with your explanation in its entirety (including free-form text and any attachments you include). : The copyright owner is fraudulently claiming copyright. I don't even know what you removed
>This is fraud and we filed a claim and you haven't responded
>Please confirm that you wish to complete this form: : --
>Electronic signature : Jennifer karu
>

This email and any files transmitted with it are confidential and intended for the addressee(s) only. If you have received this email in error, please return it to the sender and destroy the message, its attachments and all copies in your possession.

On the basis that you are the intended recipient then your receipt of this email represents your agreement to be bound by, or your continuing agreement to our standard Terms and Conditions applicable to the transaction to which this email relates. If you require a copy (or a replacement copy) of the applicable Terms and Conditions please email your request by return.

This message and any attachment are confidential and may be privileged or otherwise protected from disclosure. If you are not the intended recipient, please telephone or email the sender and delete this message and any attachment from your system. If you are not the intended recipient you must not copy this message or attachment or disclose the contents to any other person. This message is intended for Lakefront Pictures LLC recipients and its affiliates.